HERBERT NEW & DAVID W. NEW, P.C.
300 BROADACRES DRIVE, 3RD FLOOR
BLOOMFIELD, NEW JERSEY 07003
(973) 893-9696
Attorneys for Defendants
Southern Container Corp. and Steven Hill

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| **John Luscko,** | **CIVIL ACTION NO. 06-3896 (WHW)** |
| **Plaintiff,** | |
| | **REPLY DECLARATION OF BENJAMIN A.** |
| **v.** | **KARFUNKEL** |
| | |
| **Southern Container Corp., Steven Hill and John Does I-XX, Individually,** | |
| | |
| **Defendants.** | |

---

I, BENJAMIN A. KARFUNKEL, ESQ., declare and state as follows:

1.       I am an attorney at law of the State of New Jersey and an associate of Herbert New & David W. New, P.C., counsel for Southern Container Corp. ("Southern") and Steven Hill ("Hill"), (Southern and Hill collectively referred to as "Defendants") in the above matter.

2.       Among my responsibilities is the overseeing of the litigation instituted by John Luscko ("Luscko") against the Defendants.

3.       On December 4, 2008, the deposition of Hill was taken. A copy of the relevant portions of his deposition transcript are annexed hereto as Exhibit A.

4.       On November 13, 2008, the deposition of Timothy Kelly, an employee of Southern, was taken. A copy of the relevant portion of his deposition transcript are annexed hereto as Exhibit B.

5.      On October 7, 2008, the deposition of Nicholas Dottino, an employee of Southern, was taken. A copy of the relevant portions of his deposition transcript are annexed hereto as Exhibit C.

6.      On May 22, 2008, Plaintiff took the deposition of Abbie Hoffman, an employee of Southern and former employer of Plaintiff. A copy of the relevant portions of her deposition transcript are annexed hereto as Exhibit D.

7.      On May 1, 2008 the deposition of John Luscko was taken. A copy of the relevant portions of his deposition transcript are annexed hereto as Exhibit E.

8.      During discovery, Defendants produced copies of Customers Complaints generated by Southern Container Corp., redacted copies, bearing Bates Numbers 308-311 and 318-319, identifying Lai Gorman as the Complaint Coordinator, are annexed hereto as Exhibit F.

I declare under penalty of perjury that the foregoing is true and correct.

HERBERT NEW & DAVID W. NEW, P.C.
Attorneys for Defendants


By: _____
        BENJAMIN A. KARFUNKEL

Dated: September 25, 2009

# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2              CIVIL ACTION NO. 06-3896 (WHW)

 3
     JOHN LUSCKO,                    :
 4                                   :
                  Plaintiff,         :  DEPOSITION UPON
 5                                   :  ORAL EXAMINATION
           -vs-                      :         OF
 6                                   :     STEVEN HILL
     SOUTHERN CONTAINER CORP.,       :
 7   STEVEN HILL, et al.,            :  (Confidential pages
                                     :       66 to 71)
 8                Defendants.        :
     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 9

10            T R A N S C R I P T  of the

11   stenographic notes of STANLEY B. RIZMAN, a Notary

12   Public and Certified Shorthand Reporter of the State

13   of New Jersey, Certificate No. XI00304, taken at the

14   offices of Herbert New & David W. New, P.C., 300

15   Broadacres Drive, Bloomfield, New Jersey, on

16   Thursday, December 4, 2008, commencing at 10:19 a.m.

17

18

19                                COPY

20

21

22

23

24

25
```



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Hill - direct

Page 25

1    than what you have already told me.

2          A      I recall that there was an offer made.

3    I recall that he turned down an offer because of the

4    terms I think of the commission arrangement.

5          Q      How did you find out that information?

6          A      I was the Executive Vice President of

7    the company.  We have periodic meetings with the

8    Senior Vice President in charge of all of our box

9    plant operations.

10              A gentleman Nick Dottino, who you have

11   interviewed -- deposed.  During one of our -- at

12   least one of our meetings Nick would have made me

13   and Steven Grossman aware that they were trying to

14   recruit a high-powered salesman.

15         Q      Looking, again, at 298 to 299, the

16   terms of that have to be approved by you?

17         A      No.

18         Q      So Mr. Dottino had authority to make

19   that offer?

20         A      No.  He would have to go to Mr.

21   Grossman.

22         Q      So Mr. Grossman authorized that?

23              MR. KARFUNKEL:  Objection.

24         Q      298?

25         A      I can't say.  You asked me what the



**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1    compensation terms were not negotiable?

2          A       We had agreed, prior to presenting the

3    contract to the basic commission arrangement.  So

4    that was not negotiable.

5          Q       You say "we agreed."  You had agreed

6    with Regal?

7          A       I agreed with Regal.

8          Q       Did you have any further discussions in

9    person with Mr. Luscko at any time?

10         A       The next time I met Mr. Luscko in

11   person after that meeting was the time I met with

12   you and he in Manhattan.

13         Q       Before this lawsuit?

14         A       Yes.

15         Q       That was after he had been separated

16   from Southern's employment, correct?

17         A       Right.

18         Q       Did you have any discussions about or

19   concerning Mr. Luscko with anyone else at Southern

20   Container between the time the employment contract

21   was signed and the time Mr. Luscko left Southern

22   Container?

23         A       The only conversation I had was when

24   Nick Dottino at one of our frequent, because they

25   weren't on a formal schedule, meetings told me that



**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1    A    No.  Mr. Luscko, in his papers some

2  place says that he left me numerous messages and

3  didn't get a call back.  That is not my style.  Any

4  time I get a message, I return it maybe the next

5  day.  We have a voice mail system.  I check my voice

6  mail religiously.

7            So I don't understand where he was

8  coming from with those comments, but it is

9  incongruous with the way I conduct myself.

10   Q    You also get paper telephone messages?

11   A    Sometimes.

12   Q    Did you get paper telephone messages at

13 the time in 2005 or 2006?

14   A    That is a general question.

15   Q    I'm trying to find out if you got paper

16 telephone messages from Mr. Luscko outside of voice

17 mail?

18   A    No.

19   Q    You're positive of that?

20        MR. KARFUNKEL:  Objection.

21   A    Only a fool is positive.  What I

22 explained to you is the way I conduct myself in the

23 business world and I pride myself in being prompt

24 and attentive.  So unless a message fell off my desk

25 and I never saw it -- if I had a message, I would



**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1    have returned the call.

2        Q    You have no recollection of any written

3    or voice mail message from Mr. Luscko in that

4    period?

5            MR. KARFUNKEL:  Objection.

6        A    No.

7        Q    Did you have a secretary or an

8    assistant during that period?

9        A    Yes.

10       Q    Who was that?

11       A    I'm smiling because we've gone through

12   about three different secretaries during that period

13   of time.  At the moment I have none.  So I don't

14   know who the person was at that point in time.

15       Q    Did your secretary or assistant have

16   instructions from you to not take calls from certain

17   people?

18       A    No.  I will tell you this.

19            Occasionally, I would get a message

20   from somebody and I would ask my secretary to call

21   back and say "Find out what it is about" to make

22   sure it should be coming to me.

23       Q    But, in any case, you would know who

24   the caller was?

25       A    Yes.  Unless it was what they perceived


**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Mills - direct

Page 45

1   Q      Yes.

2   A      No.  Bear in mind I at that time did

3   not have any operational responsibility.

4   Q      At any conversation that you had with

5   anyone at Southern between the beginning of 2005 and

6   April of 2006 did the topic of Mr. Luscko's age ever

7   come up?

8   A      No.

9   Q      Did you ever ask Mr. Luscko about his

10  income?

11  A      No.

12  Q      Did he ever furnish you with his tax

13  return?

14  A      I think, as part of this process, he

15  furnished his tax returns to somebody.  I haven't

16  seen them.

17  Q      But not to you?

18  A      No.

19  Q      The topic of Mr. Luscko's income for

20  prior years before the Regal sale was not a subject

21  of a direct discussion between Mr. Luscko and

22  yourself?

23  A      No.

24  Q      Did you ever ask Mr. Luscko if he felt

25  he was getting too old to be in the box business?

**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdresr.com

Page 46

1      A      No.  That is really silly.  He's a

2  couple of years older than me.  I didn't think I was

3  too old to be in the box business.

4      Q      But you had different positions, right?

5  He was selling?

6      A      So was I.  When I went to Procter &

7  Gamble they were proud to have my gray hair in their

8  presence.

9      Q      Procter & Gamble?

10     A      The company's largest account.

11     Q      Oh, I see.

12     A      That was by example when you said he

13  was a salesman and I wasn't.

14     Q      Do you know a person named Victor

15  Veston?

16     A      Who?

17     Q      Victor Veston, V-e-s-t-o-n?

18     A      No.

19     Q      A moment ago you told me you had no

20  operational responsibility.

21     A      At that time.

22     Q      We're talking about the time frame of

23  2005-2006.

24     A      Yes.

25     Q      So you would not have had any

**Rizman**
**Rappaport**
**Dillon&Rose,LLC**
**Certified Court Reporters**

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Hill - direct

Page 62

1           MR. HARTMANN:   What was the objection

2    for?

3           MR. KARFUNKEL:   You keep using the

4    term" resign."  I don't think you established a

5    time?

6      A      I did say "resign."  I was required to

7    resign as an officer and Director.  Not an employee.

8      Q      Whatever your testimony was, we'll be

9    governed by that.  I don't want to put words in your

10   mouth.  I appreciate your explanation.  I think we

11   settled that.  That is not going to be an issue.

12     Q      Were you ever made aware of any

13   problems regarding the transfer of tooling or

14   customer property in the transition between Regal

15   and Southern?

16     A      Yes.

17     Q      What were you told?

18     A      In generality, I was told that the

19   Regal tooling was a nightmare; that it wasn't

20   properly maintained; it wasn't properly stored; it

21   wasn't properly organized.

22     Q      Who told you that?

23     A      Nick Dottino.

24     Q      But Regal serviced its customers before

25   the sale with that tooling, right?


**Rizman
Rappaport
Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1          A          There is a lot to be said in a positive

2    and negative way from a little company that works

3    with familiarity, doesn't have production standards

4    and works without documentation because they've done

5    it before.  That, in my estimation, is how Regal

6    functioned with the tooling they had and the

7    documentation they had.  The intense lack of

8    efficiency that that plant functioned under.

9          Q          So this inhibited Southern's ability to

10   gear up to sell to those customers?

11         A          In the short term, yes.

12         Q          How do you define "the short term"?

13         A          After Southern would have an

14   opportunity to run an item the first time, they

15   would be in a position to, A, correct any

16   deficiencies with tooling or purchase new tooling,

17   B, create the proper documentation to be able to

18   manufacture the item and, C, in some cases where it

19   wasn't manufactured or wasn't shipped correctly, the

20   customer complaints that filled the room would

21   enable Southern Container to correct its records so

22   the next time it wouldn't be done like that.

23         Q          How long would this process of

24   adjustment take?

25         A          It depends on the frequency of



**Rizman**
**Rappaport**
**Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# EXHIBIT B

1

1         IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF NEW JERSEY
2         CIVIL NO. 06-3896 (WHW)

3

4   ---------------------------
     JOHN LUSCKO,          :
5                    :
        Plaintiff,      :    DEPOSITION UPON
6                    :    ORAL EXAMINATION
        v.            :        OF
7                    :   TIMOTHY J. KELLY
     SOUTHERN CONTAINER   :
8     CORP., STEVEN HILL and :
     JOHN DOES 1-XX,     :
9     Individually,      :
                    :
10    Defendants.       :
  ---------------------------

11

COPY

12

13            T R A N S C R I P T  of the stenographic

14  notes of HOWARD A. RAPPAPORT, a Certified Shorthand

15  Reporter of the State of New Jersey, Certificate No.

16  XI00416, taken at the offices of HERBERT NEW &

17  DAVID W. NEW, P.C., 300 Broadacres Drive, Bloomfield,

18  New Jersey, on Thursday, November 13, 2008,

19  commencing at 10:20 a.m.

20

21

22

23

24

25

**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

38

1  issue that we addressed with John.
2      Q    Was there any way to override the credit
3  hold?
4      A    Only if you knew why they weren't paying
5  it. If it was a reasonable, you know, if there was
6  knowledge of a problem and it was a reasonable
7  position for the account to take, we would override
8  it, but we would need that information to do that.
9      Q    What would you have to do to override
10  it?
11      A    You would have to call up the credit
12  and, you know, state your case. It would be
13  something you would have to tell them that they are
14  not paying it because they were short shipped, or
15  they were not paying it because they had a quality
16  issue and they are going to return the boxes.
17      Q    You say call up the credit, that would
18  be the credit department in corporate?
19      A    Yes.
20      Q    Who would have the authority to do that?
21      A    The GM would need to work with credit to
22  take them off of credit hold.
23      Q    Now, Mr. Luscko worked out of Dayton
24  first?
25      A    Initially, yes.

39

1      Q    And then in Deer Park?
2      A    Right.
3      Q    Who was the GM at Dayton.
4      A    Paul Frank.
5      Q    And Deer Park?
6      A    I believe it was Joe Andrews. He was
7  right around that time frame.
8      Q    Mr. Luscko left in April 2006?
9      A    Correct.
10      Q    Was Mr. Frank still the general manager
11  of Dayton in April of 2006?
12      A    No.
13      Q    Who was?
14      A    I don't know if we had a GM at that
15  time.
16      Q    When did Mr. Frank separate?
17      A    It was in the first quarter of '06.
18      Q    Was Mr. Andrews the general manager at
19  Deer Park during Mr. Luscko's tenure at Southern?
20      A    Yeah. I don't remember the exact dates,
21  but for at least a portion of it.
22      Q    So was there someone else while
23  Mr. Luscko was still employed?
24      A    No, Joe Andrews was transferred in from
25  Syracuse. So I don't remember the exact dates that

40

1  he came in.
2      Q    Was there another general manager that
3  you remember at Deer Park between July of 2005 and
4  April of 2006?
5      A    I do not.
6      Q    Could anyone other than the general
7  manager work with credit to take an account on credit
8  hold?
9      A    No.
10      Q    Could the general manager change the
11  customer's credit limits or terms?
12      A    They could be influential, but did not
13  have the final word, credit. The credit department
14  at Southern Container was a fairly strong group.
15      Q    And that's at headquarters?
16      A    Um-hum.
17      Q    That's in Hauppauge?
18      A    Correct.
19      Q    You mentioned them being a strong group.
20  Do you know who was in the group from July of 2005 to
21  April of 2006?
22      A    I don't remember all the people. I
23  think Betty Klaiber headed the department at that
24  time.
25      Q    Do you recall anyone else in the

41

1  department?
2      A    Pat Majoski -- I'm sorry -- yeah, Pat
3  Majoski.
4      Q    Do you recall anyone else?
5      A    I don't.
6      Q    Turning again to page three, I'm looking
7  at items four, five and six. Do you have any
8  information relating to those categories?
9      A    No, nothing other than what's in the
10  packet here.
11      Q    And item seven requests information
12  relating to Mr. Luscko's responsibility as a Southern
13  employee.
14      Do you see that?
15      MR. KARFUNKEL: Objection.
16      A    Yes.
17      Q    You told me about the documents and the
18  meetings. Was a job description prepared for
19  Mr. Luscko?
20      A    I'm not sure if there was one in the
21  agreement, in the employment agreement.
22      Q    Let me rephrase the question then.
23      Other than in the employment agreement,
24  was there a written job description for Mr. Luscko?
25      A    No.

11 (Pages 38 to 41)

**Rizman**
**Rappaport**
**Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Kelly Edigar

58

1  an eight percent increase for the account and we gave
2  it to him.
3      Q      Do you recall any others?
4      A      They are listed here in this e-mail.
5  Acron/Norca, A-c-r-o-n slash N-o-r-c-a.
6      Q      Any others?
7      A      No, they are the ones that I have here.
8      Q      And the reason that Mr. Luscko gave for
9  either not wanting to pass along a price increase or
10 having a lower than market price increase was exactly
11 what?
12     A      John didn't give any answer that I'm
13 aware of that would have been acceptable.
14     Q      There are two parts to your answer. He
15 didn't give a response or he didn't give an
16 acceptable response?
17     A      He didn't give an acceptable response.
18     Q      What response did he give?
19     A      I don't recall, but I'm telling you that
20 there would not have been an acceptable response.
21     Q      Have you told me all the accounts where
22 Mr. Luscko struggled with the price increases?
23     A      Yeah, they were the accounts that I was
24 involved with.
25     Q      You also mentioned earlier that there

59

1  were issues with Mr. Luscko's account execution.
2  What did you mean by that?
3      A      Just the basic responsibilities of sales
4  and taking care of the accounts.
5      Q      Specifically, what do you mean by taking
6  care of the accounts?
7      A      Primarily communicating issues from the
8  accounts, communicating why the account wouldn't pay
9  its bills, communicating our price increase
10 requirements to the accounts.
11     Q      Was there anything else?
12     A      No. The real key issues that we had in
13 that short tenure that John was with us was trying to
14 service the accounts as we went through the
15 transition.
16            The communication issues were big. We
17 needed to know what the requirements of the accounts
18 were in order to service them properly, and we
19 weren't getting that information.
20     Q      Do you know if Mr. Luscko communicated
21 with others at Southern regarding the negative
22 feedback from the customers?
23            MR. KARFUNKEL: Objection.
24     A      No.
25     Q      Is it your understanding that if there

60

1  was feedback or communication from the customers,
2  that that had to go through you?
3      A      It should have gone through me. That
4  doesn't necessarily mean that it did.
5      Q      And you are saying it didn't?
6      A      There were accounts that John expressed
7  issues with and there were accounts that everyone at
8  that time expressed issues with. It was an avalanche
9  of complaints throughout our business during that
10 period.
11     Q      Other than the customer service
12 representatives who included Linda Birch and other
13 than yourself, who else on board at Southern could
14 have worked toward resolving these issues?
15     A      Paul Frank could have been instrumental.
16     Q      Have you spoken to Mr. Frank about
17 whether Mr. Luscko communicated customer concerns to
18 him?
19     A      I don't recall.
20     Q      Who else other than Mr. Frank?
21     A      John may have talked to anybody in
22 customer service. It's hard to know at this point.
23     Q      Outside of customer service, outside of
24 yourself and outside of Mr. Frank, was there anyone
25 else?

61

1      A      Probably very unlikely, unless he was
2  just complaining about something to somebody who
3  didn't have impact.
4      Q      Take a look again, please, at P-7.
5      A      I got it here.
6      Q      Item nine discusses sales and support
7  staff. We talked about customer service and yourself
8  and Mr. Frank.
9            Were there any other persons to whom
10 Mr. Luscko could have turned for sales support?
11     A      No. We would have been the primary
12 positions that would support sales.
13     Q      Were you familiar at all with any new
14 business that Mr. Luscko attempted to develop? By
15 new business, I'm talking about customers who had not
16 been customers at Regal.
17     A      Yes.
18     Q      What were those?
19     A      Some of the documents -- there was a
20 list that you had provided. Do you recall where that
21 is? No.
22     Q      Just take your time. If there is
23 something that you saw that is an image in your mind,
24 take whatever time you need to find it.
25     A      Here it is, page 15.

16 (Pages 58 to 61)

**Rizman**
**Rappaport**
**Dillon & Rose,** LLC
**Certified Court Reporters**

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

62

1    MR. HARTMANN:  We should probably mark
2  this.  We haven't marked this yet.
3        Let's mark this as Plaintiff's 11,
4  plaintiff's document production.
5        (Exhibit marked for identification P-11,
6  Plaintiff's document production, Bates numbers 1
7  through 172.)
8        MR. KARFUNKEL:  I have 189.
9        MR. HARTMANN:  Let's use 189 then.  I
10 think I'm working off a wrong number.
11       Yeah, you're right, it's 189.  It is
12 189.
13  Q     You were at page 15?
14  A     15, right.
15  Q     Okay.
16  A     What I can tell you is Quickie
17 Manufacturing was a prospect that John was working on
18 that would have run in the Mooresville,
19 M-o-o-r-e-s-v-i-l-l-e, facility, but from what I
20 understand it, it just didn't go anywhere based on
21 pricing and, you know, what the requirements of the
22 account were.
23  Q     Okay.
24  A     I'm not familiar with Gray Metals.
25       Alcan, A-l-c-a-n, Pak, P-a-k, I do know

63

1  that was a bid that we reviewed, but we did not feel
2  that we matched up we will with.  It was a kind of a
3  cats and dogs mix of business that at the time, quite
4  frankly, we were struggling to get all of our orders
5  out the door with all of our accounts.
6        Our focus was on the existing customer
7  base.
8  Q     Any others?
9  A     No.
10  Q     Did you ever personally do a written
11 evaluation of Mr. Luscko's job performance?
12  A     I did not.
13  Q     Was that something done ordinarily for
14 salesmen?
15  A     No.
16  Q     Is it done now?
17  A     No, unless there is a specific issue
18 that needs to be addressed.  But it's not done now.
19  Q     Do you see item 12 in the notice?  Still
20 on page three.
21  A     Yes.
22  Q     How frequently were commission
23 statements issued by Southern?
24  A     Monthly.
25  Q     And the commission statement for

64

1  Mr. Luscko was sent to you or was it sent directly to
2  Mr. Luscko?
3  A     No, it was sent to the plant.  It was
4  sent to the GM's attention.
5        Typically it would have been given to me
6  to distribute.
7  Q     Mr. Luscko contends in this case that he
8  did not receive his commission statements in a timely
9  fashion.  Is that correct or is that not true?
10  A     That's not true.
11  Q     Why is it not true?
12  A     The commission statements are attached
13 to the commission checks and they are distributed at
14 the same time.
15  Q     So you didn't hold Mr. Luscko's
16 statements back?
17  A     Everyone gets their commission
18 statements with their checks.
19  Q     Look at item 13, the complaints are what
20 are in the documents.
21  A     Yeah, the ones that we went through.
22  Q     Are you familiar with any verbal
23 complaints by customers?
24  A     Not outside of the complaints that we
25 said.

65

1  Q     Look over to page four of P-7.  I'm up
2  to item 14.
3  A     Okay.
4  Q     Another one of the plaintiff's
5  contentions in this case is that deliveries were made
6  by Southern in an untimely way.
7        On time delivery reports came up in the
8  deposition of Mr. Dottino.  Have those been produced?
9  A     They have.
10  Q     What numbers are they, or how would you
11 refer to them by what has been produced?
12  A     This is P-10?
13  Q     P-10.  What is in P-10?
14  A     P-10 is a consolidated report by plant
15 by year for on time delivery.  Actually, by plant by
16 year and by month.
17  Q     And for what years and months?
18  A     2004, one through 13 -- well, actually I
19 say month, but Southern was on a period system, so
20 there would be 13 periods rather than 12 months, each
21 period being four weeks.
22       I should specify, you asked me before
23 about the commission checks.  They came out once per
24 period.
25  Q     Okay, fair enough.

17 (Pages 62 to 65)

**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

66

```
1        A     13 periods a year.
2              2005, periods one through 13, for some
3     reason period 11 is missing.
4              2006, period one through 13 and 2007 one
5     through 13.
6        Q     How was that generated?
7        A     I had asked our corporate quality
8     director if he had a record of the on time delivery
9     by plants, and this is what he provided to me.
10       Q     The consolidated report would be for all
11    deliveries, all customers?
12       A     Right.  It is shown as a percentage,
13    percentage of on time.
14       Q     So on P-10 it is a single sheet number
15    577?
16       A     Yes.
17       Q     And who is the custodian of the data
18    that's on that page?
19       A     The data is consolidated by the
20    corporate quality manager.
21       Q     Who is that?
22       A     It used to be Ron Byers, right now I
23    believe it's Jim Eastman, E-a-s-t-m-a-n.
24       Q     That information would not help you to
25    determine how deliveries were made by customers,
```

68

```
1     simultaneous notice of the delivery date if it's
2     different from what the customer requests?
3        A     Yes.
4        Q     How is that accomplished?
5        A     Either through a phone call or a fax
6     back.  Typically if the PO is faxed in the customer
7     service rep will then go to the computer, and there
8     is a scheduling program that they will look for
9     available machine time, and then when they get their
10    date from that software they will put it on the
11    document and fax it back or call them back if it's a
12    verbal order.
13       Q     So the salesman is not involved in that?
14       A     They might be.  They may be the ones who
15    faxed the order over or called in the order.
16       Q     So if a change occurs, then the salesman
17    gets the information in the phone call or the
18    customer?
19       A     If the salesman called in the order, it
20    is likely the call is going to go back to the sales
21    rep.
22       Q     Go down the page to item 15.
23             Do you recall whether there were any
24    issues raised about returned or rejected goods
25    involving Mr. Luscko's customers?
```

67

```
1     would it?
2        A     No.  Actually, it's a production matrix
3     that is used to identify problems, not tied to an
4     account.  It is tied to, you know, you may have two
5     missed deliveries based on shipping, or three missed
6     deliveries tied to design or custom service.
7              It is used as a tool to improve your
8     operations.
9        Q     Are any records maintained of on time
10    delivery by customer?
11       A     Not that I'm aware of.
12       Q     What are the criteria for determining
13    whether a delivery is on time?
14       A     The criteria is when we receive an order
15    from a customer, we will either accept their order
16    date or not accept it.
17             Once we accept or establish a delivery
18    date, then if it does not make that delivery date,
19    then it's considered late, not on time.
20       Q     Can a delivery date change during
21    production?
22       A     No.  Once it's set, it's set.
23       Q     It is set in advance of production?
24       A     It's set in advance of production.
25       Q     And does the customer receive
```

69

```
1        A     Yeah, there were.
2        Q     What do you recall?
3        A     Well, those are fairly well documented
4     in here.
5        Q     Just refer to the document by number.
6        A     In P-8.
7        Q     Okay.
8              You have had a chance to look at P-8,
9     right, Mr. Kelly?
10       A     I have.
11       Q     Are there any incidents of returned or
12    rejected goods that you can recall that are not
13    contained in P-8?
14       A     Not that I recall.
15       Q     What was Southern's return policy
16    between July of 2005 and April of 2006?
17             MR. KARFUNKEL:  Objection.
18       A     I don't understand.
19       Q     Was there a policy that Southern
20    specifically had for allowing customers to return or
21    reject product?
22       A     Yes.  If a customer rejected product,
23    they were to notify the sales rep or the customer
24    service rep and tell them why they were rejecting it.
25             Then the product would be shipped back
```

18 (Pages 66 to 69)

**Rizman
Rappaport
Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

86

```
1   for Mr. Luscko's e-mail or fax number.  Do you see
2   that?
3       A    I do.
4       Q    And you responded, "Victor: John's
5   e-mail is copied on this message so that you can be
6   sure you will now be flooded with porn."
7           Do you see that?
8       A    I see that.
9       Q    You wrote that?
10      A    I did write that.
11      Q    You don't have this e-mail anymore?
12      A    I don't believe so.  This is from years
13  ago.
14      Q    Why did you write that Mr. Veston could
15  be sure that his e-mail would be flooded with porn?
16      A    It was a joke.  Victor had been a long
17  time customer of ours.  John knew him for a long
18  time.  We knew him for a long time.  It was just a
19  joke.  Probably not, you know, looking back, I wish I
20  didn't write it, but it was supposed to be funny, and
21  Victor laughed at it and it was a joke.
22      Q    Did Mr. Luscko bring this up with you?
23      A    He did.
24      Q    What did he say?
25      A    He was upset, didn't want me to send an
```

87

```
1   e-mail like that out on his behalf.
2       Q    Did he say why?
3       A    I don't remember if he said why or not.
4       Q    Did he tell you that the e-mail was also
5   his wife's e-mail?
6       A    You know what, he may have told me at
7   the time.
8       Q    Was that incident pretty much raised and
9   dropped or did that carry over?
10      A    No, as far as I know that was it.
11      Q    And at that time, February 2, 2006, were
12  you the sales manager of Dayton or were you already
13  the regional sales manager?
14      A    I think I was still the sales manager.
15      Q    Can you tell me when you were promoted?
16      A    Yeah, the promotion took place during
17  the acquisition of Schiffenhaus.
18      Q    When was that?
19      A    I don't remember the exact dates.  It
20  was the first quarter of 2006.
21      Q    Do you still have P-7?
22      A    Yes.
23      Q    Take a look at 22.  I'm going to go back
24  now to the process of placing orders and revising
25  orders.
```

88

```
1           If an order was placed by a customer and
2   then changed because of the machine timing that you
3   described, how would the salesman find that out?
4   Would he have to find that out from the customer or
5   did he get a copy of the new delivery date.?
6       A    No, he would normally communicate that,
7   or that would be communicated to him by customer
8   service.
9       Q    How?
10      A    Through phone.
11      Q    Phone call?
12      A    Typically a phone call.
13      Q    Did Mr. Luscko ever raise with you the
14  matter of whether he was able to get through to
15  people at customer service?
16      A    I'm sure he did.  It was difficult to
17  get through to a lot of people at that time.  John
18  would not have been alone on that.
19      Q    Does Southern keep a business record of
20  any kind, sales orders generated by customer?
21      A    By specific order?
22      Q    Yes.
23      A    I don't believe so.
24      Q    Is there a diary or a journal of any
25  kind kept of orders received with delivery dates and
```

89

```
1   then changed delivery dates?
2       A    No, not to my knowledge.
3       Q    If you had to satisfy yourself one way
4   or the other, how would you go about doing that?  Who
5   would you talk to and how would you find out?
6       A    If you wanted to find out how many
7   orders were missed for a specific account?
8       Q    No.  My last question is whether a
9   record was kept as either as a journal entry or a
10  diary entry of an order received by customer and
11  whether the delivery dates or any other items in the
12  ordered to be changed.  Is that entered anywhere
13  would be the question?
14      A    No.
15      Q    And are the purchase orders retained or
16  are they discarded once an invoice is generated?
17      A    They are kept for about six months.
18      Q    Why six months?
19      A    We run probably 70 orders a day per
20  plant.  So by the time you get to six months you've
21  got, you know, as far as paper, you know, which is
22  tons of paperwork.
23      Q    Did anyone other than Ms. Birch ever
24  complain about Mr. Luscko to your knowledge?
25          MR. KARFUNKEL:  Referring to fellow
```

23 (Pages 86 to 89)

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# EXHIBIT C

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO:  06-3896 (WHW)

JOHN LUSCKO,                          DEPOSITION UPON
                                      ORAL EXAMINATION
        Plaintiff,                          OF
                                      NICHOLAS DOTTINO
    vs

SOUTHERN CONTAINER CORP.,
STEVEN HILL and JOHN DOES I-XX,
Individually,

        Defendants.
------------------------------

COPY

        TRANSCRIPT of the stenographic notes of

ANDREA NOCKS, a Certified Court Reporter and

Certified Realtime Court Reporter of the State of

New Jersey, Certificate No. XI01573, taken at the

offices of HERBERT NEW & DAVID W. NEW, P.C.,

300 Broadacres Drive, Third Floor, Bloomfield,

New Jersey, on Tuesday, October 7, 2008,

commencing at 10:20 a.m.



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

46

1  salesperson.  We require the salesperson to
2  capture the data, assure its accuracy, assure the
3  timeliness of the data is appropriate to satisfy
4  the complaint but we don't, quote, burden them
5  with sitting and typing, filling out the form --
6      Q    That's not what I'm asking you.
7      A    Oh.
8      Q    I'm asking you where it says in the
9  box status of complaint.
10     A    Yes.
11     Q    It says created 1/9/2006 by Naomi
12  Mangroo.  Do you see that?
13     A    Yes.
14     Q    Are you able to tell from the status
15  box or any other part of the document whether the
16  salesman received a copy of the complaint?
17     A    No.
18     Q    Is it normal for the document not to
19  show the transmittal to the salesman?
20     A    100 percent.
21     Q    So --
22     A    Yes.
23     Q    Just make sure I understand, there
24  are 11 entries for the administrative status of
25  this complaint, ten or eleven entries.  Do you see

47

1  that?  All the way down to August 22nd of 2006.
2  Do you see that?
3      A    Yes.
4      Q    So all those entries are being made
5  but no entries being made to reflect the salesman
6  is aware of the comments in the root cause box or
7  the corrective action box?
8      A    Correct.
9      Q    And is this document edited each
10  time after its creation or once it's created it is
11  not edited?
12     A    It is edited typically in the
13  investigation process which would trigger a change
14  in root cause and corrective action.
15     Q    So as of today, we don't know who
16  typed what in root cause or corrective action?
17     A    Correct.
18     Q    So the reliability of this document
19  is dependent upon all the persons in the status
20  box, correct?
21          MR. KARFUNKEL:  Objection.
22          You can answer, if you understand
23  the question.
24          Do you understand the question?
25     A    I don't understand the question.

48

1      Q    To the extent you're relying on the
2  text in the root cause box and the corrective
3  action box means you're relying upon the persons
4  in the field stated status of complaint to make
5  entries or edit accurately, correct?
6      A    In addition to the people that would
7  also report to them.
8      Q    There's no other business record
9  other than this that would record the customer
10  complaint.  Is that true?
11     A    That is true.
12     Q    Can this document be edited today?
13     A    No.
14     Q    When is the document closed?
15     A    If you refer to the bottom of page
16  313, the tenth entry in that dialogue box you were
17  referring to.
18     Q    Yes.
19     A    Is when that's listed as closed, I
20  believe that becomes a viewable only template in
21  our system.  I believe.  I'm not a hundred percent
22  sure.  It's my knowledge of it.
23     Q    All right.  But in this case, before
24  August 22nd of 2006 the document could have been
25  edited?

49

1      A    Yes.
2      Q    And who had access to this document
3  between the date of its creation and the date it's
4  closed?
5          MR. KARFUNKEL:  Is that for editing
6  purposes or just reviewing --
7          MR. HARTMANN:  Yes.  For editing
8  purposes.
9      A    Certainly the folks listed in that
10  dialogue box.
11     Q    Would there be access by department?
12     A    Yes.
13          I also wasn't done.
14     Q    I'm sorry.  Go ahead.
15     A    The folks listed in that dialogue box
16  and many of their direct reports, specifically in
17  customer service and sales and depending on the
18  nature of the complaint, also a manufacturing
19  supervisor.
20     Q    The document itself doesn't tell you
21  who may have edited it, does it?
22     A    If someone wanted to not show up in
23  the box as someone who edited it, would they have
24  the capacity to do that?
25     A    I would not know how.  No.

13 (Pages 46 to 49)

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

114

1  service representative?
2          MR. KARFUNKEL:  Objection to that.
3  BY MR. HARTMANN:
4      Q    Do you understand that question?
5      A    Below as it relates to --
6      Q    Customer service.
7      A    I understand.  In comparison below as
8  it relates to income or --
9      Q    Rank.
10     A    -- responsibility?
11     Q    Both.
12     A    I would not consider customer service
13 to be entry level.
14     Q    Would a customer service
15 representative typically have anyone reporting to
16 them?
17     A    Rarely.
18     Q    Is Joe Mulholland still with the
19 company?
20     A    Yes.
21     Q    Is Dan Harbaugh still with the
22 company?
23     A    Yes.
24     Q    Can you estimate how many customer
25 service representatives were employed by Southern

115

1  Container between July of 2005 and April of 2006?
2      A    For the entire company?
3      Q    Well, for the plants where
4  Mr. Luscko reported, Dayton and then Deer Park.
5      A    I would be guessing.
6      Q    Can you estimate?
7      A    Yes.
8      Q    What would be your estimate?
9      A    Deer Park, six to seven.  Dayton,
10 five to six.  Lancaster, probably seven, maybe
11 eight.  Murphysboro, I believe I saw some sales
12 from, likely four.
13     Q    Who is Linda Birch?
14     A    Linda was a customer service
15 representative employed by Regal who we employed
16 for a short period of time physically located in
17 Dayton.
18     Q    And she worked with Mr. Luscko at
19 Regal?
20     A    Yes.
21     Q    Would that be fair?
22     A    Yes.
23     Q    Do you know why she left Southern
24 Container?
25         MR. KARFUNKEL:  Objection.

116

1          MR. HARTMANN:  I'll lay a further
2  foundation because we have an objection.
3  BY MR. HARTMANN:
4      Q    Is she still employed by Southern?
5      A    No.
6      Q    Do you know why?
7      A    I can only speculate.
8      Q    Was any reason given for her
9  separation that you're aware of?
10     A    My understanding is we have a, quote,
11 short-term employment agreement with her.  The
12 rationale for the employment agreement was she did
13 not initially want to transition from Regal to
14 Dayton, as I understand it, principally due to
15 geographic distance.  It became clear to us that
16 we would want and need additional knowledge and
17 support during the transition.  We then returned
18 to Linda with an offering for, quote, a short-term
19 employment agreement.  I forget the exact
20 structure of it, but it, in essence, detailed if
21 you stay for X period of time, you'll receive a
22 bonus, one third of it to be paid here, one third
23 here and one third at the conclusion or some
24 variation of that.  And when that employment
25 agreement ended, I believe she left shortly

117

1  thereafter which, frankly, was not a surprise to
2  anyone.  Our intent was create that employment
3  agreement in which enabled us to make the
4  transition.  We also compensated her some
5  additional monies for gas or transportation, so.
6          Did I answer your question?
7      Q    Yes.
8          Are you familiar with Mr. Luscko's
9  agreement with Southern Container in terms of
10 compensation?
11     A    I'm familiar with his employment
12 agreement.
13     Q    Okay.  And he was to be paid five
14 percent commission on sales to former Regal
15 customers.  Would that be correct?
16     A    I believe that's what it states.
17 Yes.
18     Q    Were there any other salesmen at
19 Southern who were paid on a five percent
20 commission basis?
21     A    Yes.
22     Q    Who?
23     A    Off the top of my head I don't know,
24 but there are several salespeople that make that
25 and more.  A flat five, I wouldn't be able to pick

30 (Pages 114 to 117)

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

122

1  delivery date?")
2     A     Yes.
3     Q     How would that happen?
4     A     It's an order entry system and if a
5  customer calls to request a date change, that
6  change can be applied within the system.  If
7  there's something else that would require a date
8  change, that change can manually be made also.
9  Maybe I am misunderstanding the question.
10    Q     I think I asked you a bad question.
11    A     Okay.
12    Q     If the customer requested a certain
13 delivery date and the order was placed on a
14 certain delivery date, would the plant have the
15 ability to alter that delivery date?
16    A     Sure.
17    Q     And would the customer be notified
18 of that?
19    A     They should.  Yes.
20    Q     Should?
21    A     Um-hum.
22    Q     Would the salesman be notified of
23 that?
24    A     Most often, yes.  Whether it be date
25 moving up or date moving back, yes.

123

1     Q     Do you have any knowledge of how
2  credit terms for Regal customers were determined
3  once those customers were transitioned to
4  Southern?
5        MR. KARFUNKEL:  Objection.
6     A     Only minor.
7     Q     What knowledge do you have?
8     A     We agreed initially to take their
9  portfolio of customers, transition them into
10 Southern, using the existing terms until we were
11 able to run complete D and Bs on them, gain
12 payment history, et cetera.  That's the extent of
13 my knowledge.
14    Q     Who determined the monthly credit
15 limits for particular customers, ultimately?
16    A     Credit manager.
17    Q     Who's the credit manager?
18    A     At the time I believe it was Betty
19 Klaiber.
20    Q     This would be the second half of
21 2005 and the first half of 2006?
22    A     She retired.  I can't recall exactly
23 when she retired, but --
24    Q     Betty Klaber, K-l-a-b-e-r?
25    A     A-i-b-e-r.

124

1     Q     And she's retired?
2     A     Correct.
3     Q     Was she out of Long Island?
4     A     Yep.  Yes.
5     Q     Who's in that position now?
6     A     Sheila Sedgwick.
7     Q     S-e-d-g --
8     A     W-i-c-k.
9     Q     Also in Long Island?
10    A     Correct.
11    Q     Was Miss Sedgwick employed in the
12 credit department in the second half of 2005?
13    A     I don't know.  Sheila joined us as
14 Betty was announcing her retirement and leaving,
15 so their overlap was fairly minor.
16    Q     How many people, if you know, were
17 in the credit department in the second half of
18 2005?
19    A     I'd only be guessing.
20    Q     Are there people in the credit
21 department today who were in the credit department
22 in 2005?
23    A     No.
24    Q     Do you know the process or
25 methodology by which the Regal personnel who

125

1  joined Southern were informed of changes to credit
2  terms of the former Regal customers?
3     A     In part, yes.
4     Q     What was that?
5     A     Typically credit manager would call
6  general manager who would review a sales manager
7  and then some combination of those three would
8  communicate with the salesperson.
9     Q     Did the particular manager at
10 Dayton, in this case, Mr. Kelly, have input into
11 determining the credit terms for Regal customers
12 serviced by Mr. Luscko that transitioned to
13 Southern?
14    A     Very minor, if at all.
15    Q     To whom did Miss Klaiber report?
16    A     Todd Blatterman.  Todd was our chief
17 financial officer.
18    Q     Todd?
19    A     Blatterman, B as in boy,
20 l-a-t-t-e-r-m-a-n.
21    Q     And who did Mr. Blatterman report
22 to?  We're still in 2005 and 2006.
23    A     Yeah.
24        MR. KARFUNKEL:  If anyone.
25    A     I'm sorry.

32 (Pages 122 to 125)

**Rizman
Rappaport
Dillon & Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

**166**

1  accounts and this comes from the signed Luscko
2  employment agreement.
3       Q    We're just on the transition period
4  now, right?
5       A    That wasn't your question.
6       Q    No.  No.  You said in your answer
7  before the last answer that the transition was
8  stressed and that you only wished it was true that
9  during the transition period Southern neither
10  missed a delivery nor had a quality problem.
11       A    Correct.
12       Q    And then my next question was in
13  light of your answer that the transition period
14  was stressed, which of Mr. Luscko's customers that
15  he serviced experienced a delivery or quality
16  problem during the transition period?
17       A    I don't know that that's what you
18  said, but I'll answer it that way.
19       Q    We went over chapter and verse of
20  problems in the customer complaint evaluations,
21  right?  I don't want you to tell me about that
22  again.
23       A    I believe there were Taurus problems,
24  Office Basics Novelty Cohen, I don't know how to
25  pronounce it, Helvoet Pharma, H-e-l-v-o-e-t, and

**167**

1  I'm not clear on the others.
2       Q    Were these delivery problems or
3  quality problems?
4       A    I'm not clear, although at that time
5  period there were both.
6       Q    What records would you look at to
7  pin down what the specific problems were, if any?
8       A    That becomes a little bit more
9  complicated.  Regal was still pursuing their
10  business in their building under their roof with
11  their systems, for lack of a better term.  So we
12  were not recording a lot of those transactions as
13  if we had complete control over the transaction.
14  So it's pretty spotty those first 60 days.  I
15  don't know what I would look at.  I don't believe
16  Regal maintained much, if any of that.
17       Okay to keep going?
18       Q    Yep.
19       A    Top of page seven, first paragraph,
20  John states I was not given an office or a phone.
21  No salesperson is.  We don't have assigned
22  offices.  We don't have assigned cubicles.  We
23  have a general sales area, sales bullpen, if you
24  will, where salespeople are given a group of
25  cubicles and a group of phones that they can use

**168**

1  when they come in, but no one is, quote, given an
2  office or a phone.
3       Q    Do you know how he was informed of
4  that procedure?
5       A    Specifically, no.  I could assume
6  that when we showed everyone through the
7  building --
8       Q    Can't assume, though.
9       A    Okay.
10       Q    You wouldn't know?
11       A    When we showed everyone through the
12  building, everyone was shown the customer service
13  area, the reception area, the payroll area, the
14  sales area.  So did John understand the sales area
15  was where the salespeople should have worked, I
16  would only be assuming.
17       Q    Okay.
18       A    I was never taken around to meet any
19  of the employees in the plant or the office, I do
20  not believe that was true.
21       Same page, third paragraph, John
22  goes on for several sentences describing how he
23  was not getting paid, corporate didn't have
24  records of his pay scale.  We attempted to change
25  the draw, not receiving commission checks, being

**169**

1  short on payments.  I think there were -- I know
2  there were initial problems transitioning all of
3  the Regal people in as quickly as we did.  And
4  there were initial errors.  A, I don't think -- I
5  know they were not limited to John.  B, I don't
6  believe that there was an increased or higher
7  frequency with John as compared to anyone else
8  during that time period.  I also don't believe
9  that they would have stretched beyond those first
10  two months and he's suggesting that they did.  I
11  would be surprised if that were factual.
12       I'm not arguing that there were
13  problems, but I'd be surprised if that were
14  factual.
15       Same page, fifth paragraph down,
16  John says Southern does not give any salesperson a
17  copy of invoices so it is impossible for the
18  salesperson to check his income.  And "ba", "ba",
19  "ba".  It goes on further.  Sorry.  No "ba", "ba",
20  "ba".  It goes on further with some other comments
21  related to that.  That's simply not true.  Not
22  only do salespeople get daily summaries, they get
23  weekly summaries, they get monthly summaries and
24  then they get a monthly tally with commission
25  checks and that's every salesperson.  It would

**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DOTTINO Direct

170

1  have nothing to do with simply the Regal
2  transition.
3          Same page, next paragraph down,
4  which is the sixth paragraph, in early January
5  Paul Frank called me at home to tell me that
6  Steven Grossman, Southern's owner, had personally
7  reviewed my commission for '05 and had determined
8  that I was overpaid by $16,500. That is, in fact,
9  true. We had doubled his draw for a series of
10 months. How that initial error happened, we
11 simply don't know. It was in payroll in
12 Hauppauge. No one caught it. John never offered
13 up that information. Steven being the type of
14 auditor that he is uncovered it. We informed John
15 of it. And we came to a plan that John could
16 repay it over the period of, I think five or six
17 months. I do not believe that his comments
18 regarding give me a check today, et cetera, are
19 factual.
20         Page eight, second paragraph now,
21 second paragraph down, John describes the sales
22 opportunity in North Carolina. He was given
23 prices by the owner of a company. John offered to
24 save him money, i.e., cut prices by five percent.
25 Our plant in North Carolina was not interested in

171

1  the opportunity. One month later the industry
2  lowered the cost of liner board by six percent.
3  John's comment which I don't agree with is I
4  believe that Southern knew this cost reduction was
5  coming and I lost the sales. I can't see any
6  logic from a business standpoint on why we would
7  not pursue sales because of a possible impending
8  price increase or decrease.
9          In referring back to his employment
10 agreement, we have the ability to view individual
11 opportunities and whether cost was going up or
12 going down, to me I'm not sure how that ties in,
13 in any way, shape or form. So I don't agree with
14 that statement.
15         Same page, page eight, first
16 sentence, Southern refused to provide quality and
17 service on all of my accounts. Categorically, 100
18 percent completely disagree. We -- I don't know
19 what we as a company could have done more to
20 service John's accounts or any other Regal
21 accounts during that period. We had our
22 facilities and our people working consistently six
23 and seven days, people putting in 12 to 16 hours
24 in a fashion that, quite honestly, brought our
25 business almost to our knees and when I say our

172

1  business, our long-term accounts, our long-term
2  salespeople were suffering tremendously. We were
3  on the verge of losing not only Regal business and
4  Regal employees but people that had been with us
5  for ten and 15 and 20 years and longer. Customers
6  who were unquestionably loyal to us were
7  revolting. It was easily the most chaotic period
8  I've ever seen in my career. And to assume that
9  we just categorically said we're not going to
10 provide quality or service to anyone's accounts, I
11 find ludicrous. And I don't use that term
12 lightly. We had done everything possible. And
13 the reality of it is coming out of a remarkably
14 difficult transition, the worst I had ever seen,
15 everyone is still employed with us today minus
16 John, and particularly, the Regal folks are more
17 successful today than they were then.
18         And even though many folks wanted to
19 quit, Southern people, Regal people, managers,
20 hourly workers, I think we're stronger today and
21 we're more successful today from having worked
22 through it. Minus John.
23         Last sentence in that paragraph,
24 Southern would not process -- John said Southern
25 would not process my orders and support my ability

173

1  to sell this long-standing and reliable customer.
2  I can't understand from what John describes here
3  why that would make any sense. To not process
4  orders and to not support further business growth
5  is simply reducing our own results and our own
6  benefits. With a customer who, quite frankly, we
7  found to be very attractive and who John states
8  correctly on this page, and I think on the
9  previous page, for years we had tried to retain
10 that customer. I don't see his logic. He hasn't
11 articulated logic here that I can understand, so I
12 don't agree with that.
13         Page nine --
14     Q    I'm going to interrupt you there,
15 because I should have gotten that conference call
16 from Judge Dumont by now.
17         (Discussion held off the record.)
18         (Brief recess.)
19     A    Top of page nine, first paragraph,
20 John says Paris business missed over 60 percent of
21 deliveries, Custom Building missed 75 percent,
22 Cesar's Pasta in three months never got a delivery
23 on-time. I would question the accuracy of all
24 three of those comments.
25     Q    And you would use the on-time

44 (Pages 170 to 173)

**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# EXHIBIT D

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

2

3

Civil Action No. 06-3896 (WHW)

4

5

_____

JOHN LUSCKO,

6

             Plaintiff,     ORAL DEPOSITION OF

7

       -V-           ABBIE F. HOFFMAN

8

SOUTHERN CONTAINER CORP.,
STEVEN HILL and JOHN DOES

9

I-XX, Individually,

10

             Defendants.

11

_____

COPY

12

13

14

      *    *    *    *    *

15

Thursday, May 22, 2008

16

      *    *    *    *    *

17

18

        TRANSCRIPT of proceedings in the above

19

matter taken at the law office of Fox Rothschild, 997

20

Lenox Drive, Lawrenceville, NJ, commencing at 10:25

21

a.m.

22

23

24

25



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

34

1    Porter, Wayne Marchant, Jeff Chalovich, maybe Paul
2    Frank.  It was in his office.  I don't remember.
3         Q.    So none of the former Regal salespeople
4    were included in that meeting?
5         A.    No, it was Southern's management.  No
6    one from Regal became Southern management, including
7    myself.
8         Q.    On page 15 of Mr. Luscko's employment
9    agreement there is a list of customers, and I think
10   the title there says continuing accounts, do you see
11   that?
12        A.    Yes, I do.
13        Q.    I want to ask you which of the customers
14   on that list fit within the category of customers
15   that Southern at some point determined it was no
16   longer interested in retaining.
17        A.    I don't believe any of these were a part
18   of that group.
19        Q.    So as of at least some point in 2005,
20   Southern was still interested in keeping those
21   accounts?
22        A.    That was my understanding.
23        Q.    Can you identify any of the accounts
24   that fall into the category of the determination by
25   Southern that it was not interested?

36

1    run.
2         Q.    How about Cambridge?
3         A.    Cambridge they didn't like the
4    quantities, and they didn't buy a certain piece of
5    equipment that they had said they were going to
6    purchase when we first entered into an agreement.
7         Q.    And Kramco?
8         A.    Didn't fit in their mix.
9         Q.    And you said a minute ago that you would
10   have to see a list.  Would you keep a list, do you
11   have a list in your office?
12        A.    Yes.
13        Q.    Were these your accounts?
14        A.    Two of them were.  One was not.  One was
15   Bruce Brown's.
16        Q.    So the list that you have are they
17   everyone's accounts or just your accounts?
18        A.    I have everyone's accounts.
19        Q.    Has anyone asked you to produce that
20   list --
21        A.    No.
22        Q.    -- to attorneys?
23        A.    No.  I think I pretty much know on the
24   whole customer base that went to Southern why -- I
25   think I know why the customers are no longer -- which

35

1         A.    Excuse me.
2         Q.    You say, maybe I am confused, but you
3    said a minute ago that the continuing accounts on the
4    document in front of you Southern wanted to keep
5    essentially?
6         A.    As I am aware of.
7         Q.    Can you identify specific accounts that
8    Southern determined, based on your testimony during
9    the last few minutes, that it was no longer
10   interested in?
11        A.    No.  I don't believe any of these
12   accounts fall under that category --
13        Q.    Okay.
14        A.    -- in that meeting that day.
15        Q.    So it's my understanding it's none of
16   those accounts, but you can identify specific
17   accounts that Southern decided to let go?
18        A.    I can.
19        Q.    Okay.  What are those?
20        A.    South Fork Metal, Cambridge-Lee, Kramco.
21   There is more.  I just -- I have to look at the list.
22        Q.    What was the reason for South Fork
23   Metal?
24        A.    They didn't like the quantities, and
25   they had to run on a machine that they didn't want to

37

1    customers are no longer with Southern.
2         Q.    And why is that?
3         A.    Some were because the delivery was bad
4    and some were because they didn't want them.
5              MR. HARTMANN:  We have to mark a couple
6    of things, so this might be a time to take a couple
7    minutes, rather than have you sit.
8              (Exhibit No. P-2, Answers and
9    Objections to John Luscko's First Notice to Produce
10   Documents to Southern Container Corp. and Steven
11   Hill, was marked for identification.)
12             (Exhibit No. P-3, Answers and
13   Objections to John Luscko's First Set of
14   Interrogatories to Southern Container Corp. and
15   Steven Hill, was marked for identification.)
16             (Recess.)
17   BY MR. HARTMANN:
18        Q.    I placed in front of you, Miss Hoffman,
19   P-2 and P-3.  P-2 consists of the Defendant's Answers
20   and Objections to Mr. Luscko 's Notice to Produce
21   Documents, and P-3 consists of Answers and Objections
22   by Defendants to Mr. Luscko's First Set of Written
23   Interrogatories.  Just take a minute to look at those
24   and take as much time as you need, and just let me
25   know when you've had a chance to look at those.

10 (Pages 34 to 37)

**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1    A.    I wanted to know why I didn't know, what
2  was going on with the rest of John's accounts, and I
3  believe I might have called John after I found out,
4  too, cause I was very upset.
5    Q.    You were upset because you didn't want
6  Mr. Luscko to leave or why were you upset?
7    A.    I was upset that John was in such a
8  position that he felt that he had to, and I was very
9  unhappy with Southern because of it.
10    Q.    Did you speak to anyone else about that
11  other than Mr. Kelly?
12    A.    I don't think so.  I might have sent an
13  e-mail to Nick Dottino.
14    Q.    Did anyone else call you?
15    A.    Uh-huh.
16    Q.    You have to verbalize.
17    A.    No.
18    Q.    Do you know if Southern took any
19  statements from any people regarding Mr. Luscko's
20  departure?
21    A.    I do not know.
22    Q.    Have you seen anything other than Mr.
23  Kelly's e-mail in writing that discusses Mr. Luscko's
24  departure?
25    A.    I don't believe so.  Southern really

43
1  didn't say very much about it.
2    Q.    At any time after April of 2006 have you
3  spoken to Mr. Hill about Mr. Luscko in any
4  connection?
5    A.    I had one meeting with Mr. Hill, I
6  believe it was after that.  John was not discussed.
7    Q.    Did you have any other discussions with
8  anyone in Southern's management about Mr. Luscko at
9  any time after Mr. Luscko left Southern?
10    A.    I'm sure I did.
11    Q.    Do you recall who that would have been?
12    A.    I probably had a conversation with Mike
13  Petee from the Deer Park Plant, and I've had
14  conversation on and off with Mr. Kelly.
15    Q.    What did you talk about with Mr. Petee?
16    A.    How badly John's accounts were handled.
17    Q.    Do you recall what you said?
18    A.    I don't recall what I said.
19    Q.    Did you ask him about how John's
20  accounts were handled?
21    A.    I know how John's accounts were handled.
22  I didn't have to ask that question, but he said to me
23  that it was a shame what happened with John's
24  accounts, that they really dropped the ball.
25    Q.    Anything else?

44
1    A.    Not really.
2    Q.    A minute ago you said you know how
3  John's accounts were handled.  What do you know about
4  how John's accounts were handled?  Feel free to refer
5  to the list in the back of D-2, which was the
6  employment agreement.
7    A.    At some point in time it was decided
8  that John was going to be based — what happened --
9  excuse me.  They moved some of John's accounts,
10  T-Fal, Cobra, Helvoet, Taurus up to -- and there is
11  probably more, but up to the Deer Park and Hauppauge
12  facility because they felt they could be better
13  handled out of those two plants.  This customer
14  service person at Deer Park, Lai Gorman, was the
15  absolute worse thing that could have hit those four
16  accounts in particular.  Southern couldn't make
17  delivery on the accounts.  They couldn't get the
18  orders processed on the accounts.  They couldn't find
19  tooling on those accounts.  It was a nightmare.
20    Q.    What else happened with John's accounts
21  other than that?
22    A.    All the accounts that were being run in
23  the Dayton Plant were getting late deliveries, were
24  being processed when they wanted to process them.  If
25  an order came over, and it still happens today, if an

45
1  order comes in from a customer and the purchase order
2  says date due 6/10 and Southern goes to enter it in
3  their computer and the computer comes back to them
4  and says delivery will be 6/12, they just put an X
5  through the date and change the date and fax it back
6  or e-mail it back to the customer.  Salesman never
7  knows a thing about it.
8    Q.    What else?
9    A.    I think I said pretty much of it.
10    Q.    Okay.  If you think of anything else
11  just say I remember something else.
12    A.    Okay.  I remember something else.  The
13  communication was just horrendous, just horrendous.
14  Customers didn't get proper information.  Salespeople
15  didn't get proper information.  The salesman from
16  Regal were kept well informed of everything, all
17  their accounts.  They knew what orders were placed.
18  They knew when stuff was shipping.  If something was
19  going to ship late the customer -- the salesman was
20  called and then it was up to the salesperson, if the
21  salesman was going to handle it or the customer
22  service person was going to handle it.  There is no
23  communication with Southern.  Their receiver will
24  just pick up the phone and tell the customer it's
25  going to be late, and the salesman would find out

12 (Pages 42 to 45)

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# EXHIBIT E

1

```
                UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
                 CIVIL ACTION NO. 06-3896(WHW)

------------------------------X
JOHN LUSCKO,                  )
                              )
   Plaintiff,                 )  DEPOSITION UPON
                              )  ORAL EXAMINATION
   v.                         )       OF
                              )    JOHN LUSCKO
SOUTHERN CONTAINER CORP.,     )
STEVEN HILL, et als.,         )
                              )
   Defendants.                )
------------------------------X


        T R A N S C R I P T  of the stenographic

    notes of the proceedings in the above-entitled

    matter as taken by and before Moe Sussman, a

    Certified Shorthand Reporter and Notary Public

    of the State of New Jersey, at the offices of

    Wacks & Hartmann, 55 Madison Avenue, Morristown,

    New Jersey, on Thursday, May 1, 2008, commencing

    at 9:55 o'clock in the forenoon.




              SUSSMAN & ASSOCIATES
           CERTIFIED SHORTHAND REPORTERS
                   P.O. BOX 317
             CEDAR GROVE, NEW JERSEY 07009
               TEL:  973-857-2822
               FAX:  973-239-7027
```

2

```
A P P E A R A N C E S :


        WACKS & HARTMANN, LLC

        55 Madison Avenue

        Morristown, New Jersey 07960

        973.644.0770

        Attorneys for Plaintiff John Luscko.

        By:  CHRISTOPHER E. HARTMANN, ESQ.


        HERBERT NEW & DAVID W. NEW, P.C.

        300 Broadacres Drive

        Third Floor

        Bloomfield, New Jersey 07003

        973.989.9696

        Attorneys for Defendants.

        By:  BENJAMIN A. KARFUNKEL, ESQ.
```

3

          I N D E X   T O   E X H I B I T S

NO.             DESCRIPTION              PAGE

D-1                Complaint              16

D-2         Employment Agreement          79

D-3         Asset Purchase Agreement     120

D-4         Multipage Document - first page  121
            headed Deer Park Sales Reps

D-5         Salesperson Compensation Summary 125
            for period 1/27/06 to 7/14/06

D-6         Multipage document - first page  134
            headed John Luscko Customer List

D-7         Salesperson Compensation Summary 152
            for period 8/5/05 to 10/28/05

D-8         Plaintiffs' Answers to Defen-   173
            dants' First Set of Interroga-
            tories

D-9         Sales Comparison Report        188

D-10        Batch of Invoices             191

D-11        Multipage letters addressed to:  193
            To Whom It May Concern

4

1   J O H N   L U S C K O, having been duly sworn
2   according to law by the Officer, testifies as
3   follows:
4
5   DIRECT EXAMINATION
6   BY MR. KARFUNKEL:
7       Q.   Good morning, Mr. Luscko.  My name
8   is Benjamin Karfunkel.  I represent the
9   defendants Southern Container and Steven Hill.
10          Do you know for what reason you're
11  here today?
12  A.   Yes.
13      Q.   This is a deposition that I
14  noticed through your attorney for you to appear
15  here and the purpose of the deposition is for me
16  to ask questions and for you to provide answers
17  based on the complaint that you filed against
18  the defendants.
19          Do you understand that?
20  A.   Yes, I do.
21      Q.   Have you ever been deposed before?
22  A.   I'm not sure.  Maybe once before.
23      Q.   Do you recall when that was?
24  A.   I do not remember.
25      Q.   I want to give you sort of an

41

1    assistance of a designer....and that's something
2    I did on a regular basis.
3        I was always redesigning and working with
4    the designer on samples and et cetera to present
5    to customers.
6        Q.    When you say designer, you design
7    different types of boxes?
8    A.    Yes.  That's a very essential point of my
9    sales.  I'm always going into a customer and
10   showing them how to improve his operation and to
11   do that, you then design boxes, or redesign
12   boxes, and that's what I did.
13       Q.    Did the Deer Park facility have
14   the same type of technology allowing you to
15   design and use a lab?
16   A.    With one exception:  took forever to get
17   there.  Deer Park is in Long Island, New York.
18   From Medford, New Jersey, it was probably three
19   hours one way.
20       To go to Deer Park once or twice a month
21   just inhibited my sales ability.  I didn't want
22   to spend all day at the George Washington
23   Bridge.
24       Q.    What other facilities does
25   Southern have besides Deer Park?

42

1    A.    They have ten locations.
2        Q.    Are they all within the northeast
3    area?
4    A.    One in Tennessee, one in North Carolina;
5    that's three.  Lancaster is four; Dayton is
6    five.  They have one in New York.  They have a
7    few up in the northeastern area.  I don't
8    remember where they are.
9        But they have ten plants in the eastern
10   part of the United States.
11       Q.    Did there come a time when the
12   salespersons who were stationed out of the other
13   facilities would come and use the facilities,
14   say, in this area as opposed to the one in
15   Tennessee or North Carolina?
16   A.    I don't know.
17       Q.    Other than performing design work
18   and utilizing the lab, and what you mentioned
19   beforehand trying to get information on
20   processes or orders, any other reasons to
21   physically be at the Dayton plant?
22   A.    Yes.
23       Q.    What are those?
24   A.    Normal format is....a new item, new box,
25   you bring a sample, you bring specs and you

43

1    review with the proper people so it's done
2    correctly.  And that means hands-on operation.
3        That became very difficult for me to do
4    in Deer Park.
5        Q.    Because of the long commute?
6    A.    Yes.  I would leave sometimes 6:30 in the
7    morning and get home 11 o'clock at night.
8    That's a long day.  And I didn't function well
9    the next day.
10       Q.    Did you ever make a request to
11   transfer back to the Dayton facility?
12   A.    No.  I never made a request to go to the
13   Deer Park facility either.  I don't know why I
14   was assigned to that facility.  Nobody else did
15   either.
16       Q.    So Abbie Hoffman told you --
17   A.    Abbie Hoffman was told to tell me the
18   first six months of Regal becoming part of
19   Southern that the Regal salespeople, of which
20   there were four, were to report to Abbie so the
21   process -- so she could integrate us into the
22   system.
23       Q.    Abbie told you.  Who told her that
24   you were being transferred?
25   A.    I don't know.

44

1        Q.    Ever complain to anyone about the
2    fact that you were transferred from Dayton to
3    Deer Park?
4    A.    No.
5        Q.    Why not?
6    A.    I don't complain.  I'm an employee.
7        Q.    Ever complain about not receiving
8    your commissions?
9    A.    Yes.
10       Q.    Even though you were an employee?
11   A.    Yes.
12       Q.    Anything else you complained about
13   other than not receiving the proper commission?
14   A.    Quality, service and lack of information.
15       There are certain things an employee can
16   request...like income.  That, to me, is
17   important.  That's why I'm working.
18       I worked for Southern I think for seven
19   weeks before I received a paycheck.  I
20   constantly called, including Mr. Hill, and never
21   got an answer from anybody why I was not being
22   paid.  Ask my wife.
23       MR. KARFUNKEL:  I'm not going
24   there.
25       THE WITNESS:  Okay.

45

1          (At this point there is a recess.)
2
3              A F T E R   R E C E S S
4
5    BY MR. KARFUNKEL:
6         Q.     You mentioned you complained about
7    not receiving commissions for about seven weeks.
8            Do you know of any other
9    salesperson who had the same problem?
10   A.    I don't know.
11        Q.     How many other salespersons were
12   employed by Southern in July of 2005?
13   A.    I don't know.
14        Q.     Do you know of anyone else?
15   A.    Yes.  There were five or six, but I
16   didn't know them.
17        Q.     You had no contact with other
18   salespeople?
19   A.    Occasionally you would run into somebody
20   in the office.  And once every two or three
21   months we would have a sales meeting.  Some
22   would show, some wouldn't.
23        I knew the three salesmen from Regal who
24   were salesmen for Southern.
25        Q.     What are the names of the other

46

1    people who were a carryover from the Regal era?
2    The salespeople.
3    A.    Skip McNeal, Bruce Brown, Bob Zajac....
4    and Abbie Hoffman became a salesperson for
5    Southern.
6         Q.     You mentioned there were sales
7    meetings about every two or three months.  Am I
8    correct?
9    A.    Yes.
10        Q.     Where were they held?
11   A.    Usually at a restaurant in town.  I
12   believe it was called La Pierre.
13        Q.     Which town?
14   A.    In Dayton.  In the Dayton area.
15        We would have a luncheon and a sales
16   meeting to discuss certain topics.
17        Q.     And you attended those luncheons?
18   A.    Yes.  They were required and I do what's
19   required.
20        Q.     Did you discuss any new technology
21   or any improvements that could be made with
22   regards to making sales?
23   A.    No.
24        Q.     What was discussed at these
25   luncheons?

47

1    A.    Usually delivery problems, quality
2    problems and pricing problems.
3         Q.     The people you mentioned
4    beforehand -- Bob Zajac, Abbie Hoffman, Bruce
5    Brown -- did they attend those luncheons?
6    A.    Yes.
7         Q.     Anyone else other than the people
8    you mentioned beforehand attend the luncheons?
9    A.    Yes.
10        Q.     Do you remember their names?
11   A.    No.  Southern had maybe three other
12   salesmen who I met.  Don't know who they are,
13   don't know their names, never socialized with
14   them except to see them at the meetings.
15        Q.     Who was moderating or leading
16   these meetings?
17   A.    Tim Kelly.
18        Q.     Anyone else besides salespersons
19   and Tim Kelly at these luncheons?
20   A.    Paul Frank, who was a GM, may have come.
21   I'm not sure.  I don't remember.
22        Q.     Did you voice any complaints at
23   these luncheons....
24   A.    No.
25        Q.     ....about deliveries, quality or

48

1    pricing?
2    A.    If this was a topic of discussion, yes.
3    But I wasn't there to complain.  I was there to
4    listen as to what was going on at the sales
5    meeting.  It wasn't a complaint session.
6         Maybe I misunderstood.
7         Q.     What topics were discussed at
8    these luncheons?
9    A.    Normally volume.  We needed more volume
10   or we had too much volume.
11        Pricing.  Prices were going up.  We had a
12   due date as to when we were expected to get the
13   increase.
14        That's basically I think what the
15   meetings were for.
16        Q.     Volume....what does that mean?
17   A.    Production.  We needed more production or
18   we had too much production.  There were
19   production issues all the time at Southern.
20        Q.     How many meetings did you attend
21   during your tenure at Southern?
22   A.    Maybe three, maybe four.
23        Q.     That would be the time frame
24   between July 2005 and April of 2006?
25   A.    No.

129

1  dollars. I was told Mr. Grossman wanted a check
2  that day.
3      I told them I didn't have 16 thousand 500
4  dollars. They told me they would take the
5  advance, which was 3 thousand dollars every
6  other week and deduct it until the 16 thousand
7  5 hundred dollars was paid.
8      And that's what they did. They charged
9  me for it but never got it. It went to Mr.
10  Grossman.
11      Q.    You were paid in advance
12  3 thousand for which months?
13  A.     I was paid at Regal 2 thousand dollars a
14  week as a draw. I was supposed to be paid
15  2 thousand dollars a week as a draw and Mr. Hill
16  said I would.
17      But what happened was, I got nothing for
18  about seven weeks, no pay, no commissions,
19  nothing.
20      They finally said we'll give you
21  15 hundred dollars a week draw, not two
22  thousand. We're not going to give you two
23  thousand. So they changed the rules again and
24  decided to give me 15 hundred dollars a week
25  draw.

130

1      But they pay every other week. So they
2  were going to give me 3 thousand dollars every
3  other week for a four-week period, which came
4  out to 6 thousand dollars.
5      What they did was, they gave me two
6  checks a month of 3 thousand dollars each for a
7  draw. When the commission summary was done, I
8  had gotten 6 thousand dollars a month. They
9  only deducted 3 thousand dollars because I never
10  got a commission summary. I did not know this.
11      Apparently I was told that Mr. Grossman
12  was checking my commissions in January and came
13  up with they overpaid me by 16 thousand
14  5 hundred dollars.
15      I was told to report to the office the
16  next morning with Tim Kelly and Paul Frank, who
17  had this, and I said I never seen this.
18      So they substantiated that I was being
19  paid 6 thousand dollars and only deducted four,
20  so I owed them 16 thousand 500. I agreed.
21      They said instead of paying you a draw,
22  from now on we'll take the draw and give it to
23  Mr. Grossman until the 16 thousand 500 was paid.
24      If you will look at what my commissions
25  came out to -- and that's prior to taxes --

131

1  8 thousand dollars after taxes. I was starving.
2      It has it here. (Reviews document).
3      I'm sorry. My commission was 8 thousand
4  55 dollars and I got 2 thousand 55 dollars for
5  the month.
6      Q.    So you received an advance of
7  3 thousand dollars for what period of time?
8  A.     September, October, November, December I
9  got 3 thousand dollars every two weeks, which
10  came out to 6 thousand dollars a period.
11      Southern worked on 13 four-week periods.
12  Instead of getting 3 thousand dollars advance in
13  January, February, March and April, they took
14  that money and gave it to Mr. Grossman because
15  they had overpaid me.
16      I did not make that decision. They said
17  they're going to take that and give it to Mr.
18  Grossman because we overpaid you.
19      Q.    Looking at column number 3 for
20  March of '06, it shows net sales of 155 thousand
21  dollars.
22  A.    Yes.
23      Q.    Then the following month in April
24  of '06 it shows sales of 59 thousand dollars.
25  A.    Yes.

132

1      Q.    And you received your commissions
2  based on those sales for those months?
3  A.    Less deductions.
4      Q.    Okay, less deductions. But you
5  received the commissions less deductions.
6  A.    If you see Special Deductions, they took
7  away 75 hundred dollars and commissions earned
8  was 29 hundred. So I was in arrears of 45
9  hundred 41 dollars. I was owing them money.
10  That's why I resigned.
11      Q.    In March of '06 --
12  A.    No. I thought you said April.
13      Q.    It's a new question.
14      In March of '06 it shows
15  commissions earned of 73 hundred less special
16  deductions of 3 thousand dollars, amount paid of
17  43 hundred dollars.
18      Did you receive that 43 hundred
19  dollars in March of '06?
20  A.    I would think so.
21      Q.    Do you know why they gave you
22  special deductions of 75 hundred dollars in
23  April of '06 whereas in the previous month they
24  were only deducting 3 thousand dollars?
25      MR. HARTMANN: You're asking him

145

1  and not by making telephone calls.
2         Did there ever come a point that
3  you had to use e-mail accounts to communicate
4  with customers?
5  A.   I had an office in my house after August
6  -- which is very modern. I have computers, I
7  have everything in there. And I don't...
8        My wife does my office work. She does
9  all my e-mails. She receives and sends. I
10  don't do them. But I do have an e-mail.
11      Q.   Did Southern provide you with an
12  e-mail address?
13  A.   No, I had my own.
14      Q.   In the course of your training or
15  every-day use, what programs are you competent
16  in with regards to computer usage?
17  A.   None. My wife does my office work for
18  me. She receives all VoiceMails, she receives
19  all faxes and she returns everything.
20      Q.   So if someone at Southern wanted
21  to contact you, would they do it through e-mail
22  sometimes?
23  A.   If they contacted me through e-mail, I
24  would get it when I came home at night. I
25  didn't travel with a computer during the day.

146

1      So, they could e-mail me during the day,
2  they could fax me during the day. They would
3  send it to the house.
4      When I got home, I would respond to it.
5  My wife would do it.
6      If it was a program, I would buy it. My
7  wife would do it or I would be supplied with a
8  program.
9      Q.   So you would tell your wife what
10  to write and she would --
11  A.   She would type it up and do it.
12      Q.   Now we'll get to page 18, which
13  you were excited about before.
14  A.   Okay.
15      Q.   Can you explain to me, on the
16  Earnings side, which is the left side of the
17  page, it has a commission line of 28,946 of
18  year-to-date.
19  A.   Yes. Can I explain it to you?
20      Q.   Please.
21  A.   Sure. If you look at the other sheet we
22  looked at, we had January, February, March and
23  April, it comes out to 28,946 -- which the last
24  one was 45 hundred dollars in arrears.
25      Q.   You're referring back to Exhibit

147

1  D-5?
2  A.   I don't know what it is, but you showed
3  me...(reviews document)...yes.
4      Q.   If you can pull out D-5 again?
5  I'm referring back to page 18.
6  A.   Yes. If you look at those, that's
7  year-to-date. If you add those numbers up, they
8  came out to 28,026. This is 29,000. That's
9  January, February, March and April.
10      Q.   You already answered my question,
11  so we'll go on to the next one.
12      Underneath the commission line it
13  has h-o-l off...on the Earnings portion.
14  A.   I don't know...
15      Q.   Do you see it?
16  A.   I see it. I don't know what it means.
17      Q.   Did you have any holiday pay while
18  working at Southern?
19  A.   No.
20      Q.   Next line has r-e-g  h-r-s, so
21  that means hours. Do you know what that refers
22  to?
23  A.   Yes. They determined that a workweek was
24  40 hours -- because I believe to get credit for
25  a year you needed a thousand hours.

148

1      So if you calculate 40 hours a week, you
2  don't have to work for the company for a year.
3  But you get credit for a year for retirement,
4  things of that nature.
5      Most companies do it that way.
6  Weyerhaeuser does the same thing.
7      As a salesman, you wouldn't be punching a
8  clock and working 40 hours. You were given a
9  40-hour workweek. If you worked 50 weeks at 40
10  hours, it comes out to two thousand. You have
11  to work a thousand hours to get extra
12  compensation.
13      If I left and worked over a thousand
14  hours, I would have gotten credit on the
15  retirement plan for that year. So I think
16  that's why they do it.
17      So again, if you take the hours times the
18  weeks, it will come out to whatever the number
19  is.
20      Q.   In this period you weren't paid
21  any additional amounts for regular hours. It
22  seems at some point during 2006 you were paid
23  for regular hours. Is that correct?
24  A.   No. If I worked for Southern for seven
25  months and left and I had 10 years with them of

# EXHIBIT F

*Southern Container Corp.*
*Hauppauge Division*
115 Engineers Road Hauppauge, NY 11788

 **Customer Complaint**

| Approved & Closed | | |
|---|---|---|
| Customer Complaint #: HPG CC-4777 <br><br> RD Number: <br> RD Date: <br> RD Amount: | Date Created: 11/11/2005 <br> Priority Code: High <br> Requested Completion Date: 11/25/2005 | |
| Complaint Author: Lui Gorman | Complaint Type:  RMA Required: <br><br> Complaint Source: | |
| Customer: T-FAL CORP #8724 <br> Customer ID Number: 8724 <br> Location: ONE BOLAND DR STE101, WEST ORANGE, NJ 07052  US <br> Pickup Address: | Customer Contact: <br> eMail Address: <br> Salesperson ID#: RL <br><br> Customer Tracking No. | |

| Job#: 102353 | Manifest#: 611132 | Ident: 9978807 |
|---|---|---|
| Invoice#: 16939 | Invoice Date: 09/06/2005 | Billed Pieces: 950 |
| Complaint Qty: 950 | Price/M: | Invoiced Amount: |

PROBLEM DESCRIPTION:  didn't order the boxes

| QUANTITY FLOW | | RETURNED DISPOSITION INFORMATION | | | REBILL INFO | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Inv # | Inv Date | Quantity |
| Ordered: | | Pick Up Date: | Job Lots: | 0 | | | | |
| Planned | | RMA: | Baled: | 0 | | | | |
| Cut: | | Additional Info: | Inventory: | 0 | | | | |
| Converted: | | | Rework: | 0 | | | | |
| Shipped: | | | Reship: | 0 | | | | |
| Cust Signed: | | | Qty Returned: | 0 | Rebill Amount: | | | |

| CHARGEBACK INFO | | AUTHORIZED DEDUCTION | | RD Problem Code: |
|---|---|---|---|---|
| C/B Amount: | $0.00 | Pieces x S/M   0   x   $0.00 = | $0.00 | RD Assignment Category: |
| C/B Date Issued: | | Additional Credit | $0.00 | Problem Code: <br> CS11 WRONG ITEM BOOKED-CS |
| C/B Date Paid: | | Total Credit | $0.00 | Non-Salvageable Cost: <br> $0.00 |

ROOT CAUSE:  Kelly Oddone E-Mailed SCC saying she had a new order for Item #9978807, 1000 pcs, and wanted to know the best delivery date.  To get ahead of the game, the order was processed. However, T-Fal never sent in a PO, because they ultimately did not need the boxes.
CORRECTIVE ACTION:  Customer Service will not process any orders without an express Purchase Order.

| Complaint Responsibility: | | | |
|---|---|---|---|
| Department | Machine | Shift | Responsible |
| CustomerService | | | |

Additional Information / Attachments:

Customer Complaint Coordinator Section:

| Routed To: Doris Jacobs | Copy To: | Quality Manager: Doris Jacobs; Doris Jacobs |
|---|---|---|

| Reassigned To: Mike Petce | |
|---|---|

Status of Complaint:
Created -- 11/11/2005 by Lai Gorman
Sent to Complaint Coordinator -- 11/11/2005 by Lai Gorman
Rejected -- 11/14/2005 by Doris Jacobs. Rejected because: If this is a credit
where are the boxes?
Mailed for Approval -- on: 05/28/2006 by Mike Petce
Complaint Approved By Bill Stonebreaker -- Dated: 08/21/2006
Complaint Approved @ Plant Level -- 08/21/2006
NO CORPORATE APPROVAL REQUIRED
Complaint Approved & Closed -- Dated: 08/21/2006

| Document Link Field: |
|---|

| Complaint Mailed for Approval:  Date: 05/28/2006 |
|---|

# PLANT APPROVAL SECTION

Name:  Doris Jacobs     Approved - 08/10/2006 by Doris Jacobs
Title: Quality Manager System Authorized Backup for - Doris Jacobs

Name: Bill Stonebreaker  Approved - 08/21/2006 by Bill Stonebreaker
Title: General Manager

*Southern Container Corp.*
*Hauppauge Division*
115 Engineers Road Hauppauge, NY 11788

 **Customer Complaint**

| Approved & Closed | |
|---|---|
| Customer Complaint #: HPG CC-4930 | Date Created: 11/18/2005<br>Priority Code: High<br>Requested Completion Date: 12/02/2005 |
| RD Number:<br>RD Date:<br>RD Amount: | |
| Complaint Author: Melissa Campos | Complaint Type:   RMA Required<br><br>Complaint Source: Customer |
| Customer: T-FAL CORP #8724<br>Customer ID Number: 8724<br>Location: ONE BOLAND DR STE101, WEST ORANGE, NJ 07052 US<br>Pickup Address: T-fal Corp<br>2121 Edco Road - Millville, NJ | Customer Contact:<br>eMail Address:<br>Salesperson ID#: RL<br><br>Customer Trucking No.: |
| Job#: 101989 | Manifest#: 615848 | Ident: 9936601 |
| Invoice#: 17826 | Invoice Date: 11/15/2005 | Billed Pieces: 730 |
| Complaint Qty: 730 | Price/M: | Invoiced Amount: |
| PROBLEM DESCRIPTION:  Wrong Item | | |

| QUANTITY FLOW | | RETURNED DISPOSITION INFORMATION | | | | REBILL INFO | | |
|---|---|---|---|---|---|---|---|---|
| Ordered: | | Pick Up Date: | 12/05/2005 | Job Lots: | 730 | Inv # | Inv Date | Quantity |
| Planned | | RMA: | 47798 | Baled: | 0 | | | |
| Cut: | | Additional Info: | | Inventory: | 0 | | | |
| Converted: | | | | Rework: | 0 | | | |
| Shipped: | | | | Reship: | 0 | | | |
| Cust Signed: | | | | Qty Returned: | 730 | Rebill Amount: | | |

| CHARGEBACK INFO | | AUTHORIZED DEDUCTION | | RD Problem Code:<br>050 SPECIFICATIONS/DESIGN | |
|---|---|---|---|---|---|
| C/B Amount: | $0.00 | Pieces x S/M | = | RD Assignment Category:<br>16 CUSTOMER SERVICE - NON SALV. | |
| C/B Date Issued: | | Additional Credit | $0.00 | Problem Code:<br>CS11 WRONG ITEM BOOKED-CS | |
| C/B Date Paid: | | Total Credit | | Non Salcageable Cost: | |

ROOT CAUSE: we processed 9936601 vs 9933601
CORRECTIVE ACTION:  Reviewed new item procedures with all the CSR and should pay more attention to the Ident when processing order.

| Complaint Responsibility: | | | |
|---|---|---|---|
| Department | Machine | Shift | Responsible |
| CustomerService | | | |

**Additional Information / Attachments:**

**Customer Complaint Coordinator Section:**

| Routed To: Doris Jacobs | Copy To: | Quality Manager: Doris Jacobs |
|---|---|---|

| Reassigned To: Lai Gorman | |
|---|---|

**Status of Complaint**
Created -- 11/18/2005 by Melissa Campos
Return Authorization Created -- Dated: 11/18/2005
Sent to Complaint Coordinator --11/18/2005 by Melissa Campos
Acknowledged --11/21/2005 by Doris Jacobs
Reassigned --11/21/2005 by Doris Jacobs
Update Sent to Complaint Coordinator --01/05/2006 by Lai Gorman
Reassigned --01/06/2006 by Doris Jacobs
Update Sent to Complaint Coordinator --01/16/2006 by Lai Gorman
Reassigned --01/17/2006 by Doris Jacobs
Update Sent to Complaint Coordinator --01/23/2006 by Lai Gorman
Mailed for Approval -- on: 01/24/2006 by Doris Jacobs
Complaint Approved By Doris Jacobs -- Dated: 01/24/2006
Complaint Approved By Joe Andrews -- Dated: 01/24/2006
Complaint Approved & Closed -- Dated: 01/24/2006

| Document Link Field: |
|---|

| Complaint Mailed for Approval: Date: 01/24/2006 |
|---|

# PLANT APPROVAL SECTION

**Name:** Doris Jacobs      Approved - 01/24/2006 by Doris Jacobs
**Title:** Quality Manager

**Name:** Joe Andrews      Approved - 01/24/2006 by Joe Andrews
**Title:** General Manager

*Southern Container Corp.*
*Hauppauge Division*
115 Engineers Road Hauppauge, NY 11788

 **Customer Complaint**

| Approved & Closed | |
|---|---|
| Customer Complaint #: HPG CC-5663<br><br>RD Number: 937<br>RD Date: 11/21/05<br>RD Amount: | Date Created: 01/04/2006<br>Priority Code: Immediate<br>Requested Completion Date: 01/11/2006 |
| Complaint Author: Doris Jacobs | Complaint Type:  RMA Required<br><br>Complaint Source: RD937 |
| Customer: T-FAL CORP #8724<br>Customer ID Number: 8724<br>Location: ONE BOLAND DR STE101, WEST ORANGE, NJ 07052  US<br>Pickup Address: | Customer Contact:<br>eMail Address:<br>Salesperson ID#: RL<br><br>Customer Tracking No. |

| Job#: 101957 | Manifest#: 609981 | Ident: 32082000 |
|---|---|---|
| Invoice#: 17014 | Invoice Date: 09/13/2005 | Billed Pieces: 5105 |
| Complaint Qty: 905 | Price/M: | Invoiced Amount |

**PROBLEM DESCRIPTION:**  Customer deducted for 5105 pieces claiming they did not order, but only returned 4200 - see CC-4110 and CC-4111. Per Lai 1/24/06 - customer will pay. Per Mike Petee 5/4/06 - customer will not pay.

| QUANTITY FLOW | | RETURNED DISPOSITION INFORMATION | | | | REBILL INFO | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Inv # | Inv Date | Quantity |
| Ordered: | | Pick Up Date: | | Job Lots: | 0 | | | |
| Planned | | RMA: | | Baled: | 0 | | | |
| Cut: | | Additional Info: | | Inventory: | 0 | | | |
| Converted: | | | | Rework: | 0 | | | |
| Shipped: | | | | Reship: | 0 | | | |
| Cust Signed: | | | | Qty Returned: | 0 | Rebill Amount: | | |

| CHARGEBACK INFO | | AUTHORIZED DEDUCTION | | | RD Problem Code:<br>020 QUANTITY (INCLUDING WASTE WEIGHT) | |
|---|---|---|---|---|---|---|
| C/B<br>Amount: | $0.00 | Pieces x S/M | | = | RD Assignment Category:<br>16 CUSTOMER SERVICE - NON SALV. | |
| C/B Date Issued: | | | Additional Credit | $0.00 | Problem Code:<br>CS11 WRONG ITEM BOOKED-CS | |
| C/B Date Paid: | | | Total Credit | | Non-Salvageable Cost: | |

**ROOT CAUSE:**  CUSTOMER EMAILS ALL ORDERS WITH PO#. AT TIME THE CUSTOMER IS DESPERATELY LOOKING FOR BOXES AND I HAVE BEEN PROCESSING ORDER AND ONCE I ADVISED THE CUSTOMER THE DUE DATE- SHE USUALLY FOLLOWUP WITH A PO.
**CORRECTIVE ACTION:**  WILL NOT PROCESS AN ORDER WITHOUT PO

| Complaint Responsibility: | | | |
|---|---|---|---|
| Department | Machine | Shift | Responsible |

| CustomerService | | | | |
|---|---|---|---|---|

**Additional Information / Attachments:**

**Customer Complaint Coordinator Section:**

| Routed To: Doris Jacobs | Copy To: | Quality Manager: Doris Jacobs |
|---|---|---|

| Reassigned To: Lui Gorman | |
|---|---|

**Status of Complaint:**
Created -- 01/04/2006 by Doris Jacobs
Sent to Complaint Coordinator -- 01/04/2006 by Doris Jacobs
Acknowledged -- 01/04/2006 by Doris Jacobs
Reassigned -- 01/04/2006 by Doris Jacobs
Reassigned -- 01/24/2006 by Doris Jacobs
Acknowledged -- 02/03/2006 by Mike Petee
Reassigned -- 02/03/2006 by Mike Petee
Acknowledged -- 02/03/2006 by Mike Petee
Reassigned -- 05/04/2006 by Doris Jacobs
Update Sent to Complaint Coordinator -- 05/05/2006 by Lui Gorman
Mailed for Approval -- on: 05/05/2006 by Doris Jacobs
Complaint Approved By Bill Stonebreaker -- Dated: 05/05/2006
Complaint Approved @ Plant Level -- 05/05/2006
Complaint Approved & Closed -- Dated: 05/16/2006

| Document Link Field: |
|---|

| Complaint Mailed for Approval: Date: 05/05/2006 |
|---|

# PLANT APPROVAL SECTION

**Name:** Doris Jacobs    Approved - 05/05/2006 by Doris Jacobs
**Title:** Quality Manager

**Name:** Bill Stonebreaker Approved - 05/05/2006 by Bill Stonebreaker
**Title:** General Manager