Benjamin A. Karfunkel (BAK1525)
HERBERT NEW & DAVID W. NEW, P.C.
300 BROADACRES DRIVE, 3rd FLOOR
BLOOMFIELD, NEW JERSEY 07003
(973) 893-9696
Attorneys for Defendants
Southern Container Corp. and Steven Hill

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| **John Luscko,** | **CIVIL ACTION No. 06-3896 (WHW)** |
| **Plaintiff,** | |
| | **REPLY 56.1 STATEMENT OF** |
| | **UNDISPUTED FACTS** |
| **Southern Container Corp., Steven Hill** | |
| **and John Does I-XX, Individually,** | |
| | |
| **Defendants.** | |

---

Southern Container Corp. ("Southern") and Steven Hill ("Hill") hereby submit this

Reply 56.1 Statement of Undisputed Facts, in response to Plaintiff's Additional References to the

Record in Discovery, (¶¶ 34 through 58 of Plaintiff's Responses to Defendants' Rule 56.1

Statement) despite the fact that Plaintiff's Statements are immaterial with respect to Defendants'

motion for summary judgment, as follows:

34.   Regal's principal owner and CEO, Abbie Hoffman, testified that Luscko was

Regal's largest producer at the time of the acquisition. According to Hoffman, Luscko is a

terrific salesman. She vouched for his honesty and trustworthiness. (Deposition of Abbie F.

Hoffman dated May 28, 2008 ("Hoffman Dep."), excerpts of which are attached to the

Declaration of Christopher E. Hartmann dated August 31, 2009 ("Hartmann Decl.") as Exhibit

"A", 14-8 to 16-1; 17-25 to 18-3.)

**Response: Admitted that John Luscko ("Luscko" or "Plaintiff") has**

**accurately portrayed Abbie Hoffman's testimony. In fact, Plaintiff was specifically**
**included in the Asset Purchase Agreement as a condition of Southern's purchase of Regal**
**Corrugated Box Co., Inc.'s ("Regal") assets, unless Southern waived that condition. See**
**Declaration of Benjamin Karfunkel, dated June 29, 2009 ("Karfunkel Dec."), Exhibit H,**
**page 22. By virtue of the fact that Southern entered into an Employment Agreement with**
**Plaintiff (Karfunkel Dec., Exhibit I), it is clear that Southern wanted Plaintiff to serve as**
**one of its salespersons.**

35.   A year or so before Southern acquired Regal, its founder, Jerry Epstein died
suddenly. Luscko considered finding new employment with the assistance of a placement firm.
That placement effort led Luscko to Southern. Southern engaged in serious discussions with
Luscko about employment. Negotiations ended when Southern balked at paying Luscko's
established commission rate of five (5%) percent. According to plaintiff, Southern's
representatives said that Southern would never pay a salesman commissions at 5% because that
would be too disruptive to its organization. (Deposition of John Luscko dated May 8, 2008
("Luscko Dep."), excerpts attached to the Hartmann Decl. as Exhibit "B", 35-20 to 36-19).

**Response: Admitted in part and denied in part. Southern is unable to respond**
**to the statement that "serious" discussions took place with Plaintiff about an employment**
**opportunity a year before Southern acquired Regal's assets, as the term is vague, and**
**discussions a year prior to Plaintiff's Employment Agreement are immaterial. However, it**
**is admitted that an offer was made to Plaintiff on or about April 3, 2004, but Plaintiff did**
**not accept it because he was either concerned about "guarantying performance" (See**
**Karfunkel Dec., Exhibit F, page 31) or "the commission arrangement". See also Reply**
**Declaration of Benjamin Karfunkel dated September 25, 2009 ("Reply Karfunkel Dec."),**

**Exhibit A, page 25.**

36.   Abbie Hoffman said that her impression was that everything [in the context of sales orders] would be handled at Southern in the same way that it had been handled at Regal. She testified about the need to keep customers happy and for Regal salespeople to be "well taken care of." (Hoffman Dep. at Hartmann Decl., Ex. "A", 24-4 to 24-21.)

**Response: Admitted that Plaintiff has accurately portrayed Abbie Hoffman's testimony, but that her understanding of the Asset Purchase Agreement between Regal and Southern is immaterial to Plaintiff's causes of action.**

37.   [The lengthy text concerning representations made to Luscko by Hill is a verbatim quote from plaintiff's deposition testimony.] (See Luscko Dep., at Hartmann Decl., Ex. "B", 81-20 to 87-20; 101-7 to 102-6). Luscko also disputes that Southern paid him a five percent commission on the product sold to each of the identified accounts. (Id. at 37-3 to 39-12).

**Response: Denied. Plaintiff cites eight (8) pages of testimony without any specific Statement of Fact. To the extent that plaintiff had made a specific Statement of Fact, Hill testified that Southern wanted all the salesmen to enter into contracts with Southern and that the five (5) percent flat commission would be maintained for the former Regal accounts. See Karfunkel Dec., Exhibit G, page 30. In addition, Hill testified that Southern had a strong organization with vast manufacturing capabilities and would offer Plaintiff a new place from where he could grow his business and that things for him ought to be better with Southern than they were with Regal. Id. at page 31. In addition, Defendants deny Plaintiff's allegation that Southern failed to pay him 5 percent commission on the products sold. Other than Plaintiff's self-serving testimony, Plaintiff cites no documentation to support such an allegation. See Karfunkel Dec., Exhibit J which**

supports the contrary.

38.   Plaintiff testified that he had the right to assume that ". . . Southern would deliver the quality and service that a normal corrugated company would do to fulfill each account." (See Id., 82-23 to 83-2).

**Response: No response is necessary as this is not a Statement of Fact. Plaintiff is merely reciting his previous opinion as to what he believes his rights were under the Employment Agreement. Whether there was a material breach of the Employment Agreement is a legal issue discussed in Defendants' Moving Brief and Reply Brief.**

39.   Hill had asked Luscko if plaintiff felt too old to sustain his level of productivity. (See Plaintiff's answer to defendant's interrogatory number 21; Karfunkel Decl., Exhibit L, page 19).

**Response: Denied. Plaintiff has not accurately cited the Interrogatory in question. Although Defendants dispute that this statement was ever made, the citation should more accurately state, "Steven Hill asked plaintiff if plaintiff was getting too old to continue in his position." See Karfunkel Dec., Exhibit L, page 19. Plaintiff's productivity, based on his age, was never discussed. Hill also never had any conversation where the topic of Luscko's age was discussed. See Reply Karfunkel Dec., Exhibit A, pages 45 - 46.**

40.   After Southern took over plaintiff lost 35 accounts and six million dollars of business within six months. (See Id., 82-1 to 82-22).

**Response: Denied. See Karfunkel Declaration, Exhibit Q, which shows the accounts which continued to purchase product from Southern after it purchased Regal's assets. In addition, Plaintiff contributed to problems that Southern had following the transition period. See Karfunkel Dec., Exhibit E, page 33.**

41.    Southern failed to enter or process many orders originated by plaintiff, without advance warning or later explanation. (See Id., 20-5 to 26-8. For additional detail, see Plaintiff's Interrogatory Answers at Karfunkel Decl., Ex. "L", pp. 8-16). Southern is unable to reconstruct Luscko's customer orders from 2005 and 2006. (Deposition of Nicholas Dottino dated October 7, 2008 ("Dottino Dep."), attached to Hartmann Decl. as Exhibit "C", 56-4 to 56-14). Southern could not produce its document retention policy. (Id., 72-10 to 74-2).

**Response: No response is necessary to the majority of this statement, as it is immaterial. To the extent that the statement proposes to be a material fact, Southern has already admitted that it had problems during the transition period due to, among other things, the sabotage by former Regal employees. See Plaintiff's Response to Defendants' Statement of Undisputed Fact, Statement 18. In addition, Southern was missing critical data necessary to process orders. See Karfunkel Dec., Exhibit E, page 28.**

42.    Southern faked its "on time" delivery reports. (Hoffman Dep. at Hartmann Decl., Ex. "A", 60-9 to 60-11).

**Response: Denied. This Statement of Fact is immaterial and intended solely to disparage Southern. To the extent that it is deemed material, Southern states that once it accepted or established a delivery date, the delivery date can not be changed. See Reply Karfunkel Dec., Exhibit B, page 67. See also Karfunkel Declaration, Exhibit N, the On-Time Delivery spreadsheet for the relevant time period, showing many months with timely delivery problems.**

43.    Records of customer complaints were subject to alternation even after Luscko left Southern. (Dottino Dep. at Hartmann Decl., Ex. "C", 41-5 to 49-25, and particularly 48-49).

**Response: Denied. This Statement of Fact is immaterial and intended solely to**

**disparage Southern. Customer complaint records could be edited after its creation to provide updated information. See Reply Karfunkel Dec., Exhibit C, pages 48-49. In addition, Plaintiff has only stated that they were subject to alteration, but not that actual alteration occurred.**

44.   Southern secretly set onerous credit terms that artificially limited Luscko's customers' ability to fulfill their monthly requirements. The credit limits bore no reasonable relation to the accounts' purchasing history at Regal. Orders to financially fit accounts (notably, T-Fal) were rejected when those accounts exceeded Southern's artificial credit limits. Accounts were embarrassingly placed on "credit hold." Expected orders were not placed. Depositions of two managerial executives, identified by defendants as 30(b)6 witnesses, as well as Regal's former principal, Hoffman could not pierce the veil of secrecy shrouding Southern's home office's credit department. Hoffman Dep at Hartmann Decl., Ex. "A", 62-23 to 64-20. Luscko Dep. at Hartmann Decl., Ex. "C", 123-1 to 125-14; and Deposition of Timothy J. Kelly dated November 13, 2008, Hartmann Decl., Exhibit "D", 34-24 to 41-5.

**Response: Denied. Plaintiffs' Statement of Facts goes beyond its intended usage. Plaintiff should reserve his passionate arguments to his Opposition Brief. To the extent that a Statement of Material Fact is provided, both Tim Kelly and Nicholas Dottino testified that the credit department was in charge of making credit limits and provided names of individuals who worked in those departments, thereby eliminating any "secrecy" to this department. See Reply Karfunkel Dec., Exhibit B, page 40 and Exhibit C, page 124. Plaintiff has not deposed the individuals named or submitted any evidence that credit terms were not reasonable. In addition, Abbie Hoffman and Plaintiff were not part of Southern's management team. See Karfunkel Dec., Exhibit C, page 31.**

45.   Southern secretly decided which accounts it would support and which accounts would ultimately be left by the wayside. (Hoffman Dep. at Hartmann Decl., Ex. "A", 26-17 to 31-19, particularly 31-5 to 31-19.)

**Response: Denied. Abbie Hoffman testified that she did not have the information concerning the process used by Southern to review accounts. See Karfunkel Dec., Exhibit C, page 32. In addition, Defendants object to Plaintiff's use of the term "secrecy", as Ms. Hoffman was not part of Southern's management. See Reply Karfunkel Dec., Exhibit D, page 34. Even so, Ms. Hoffman could not identify any customer that was part of Plaintiff's existing accounts that Southern determined it was no longer interested in retaining. Id.**

46.   The purpose of Southern's Regal acquisition was to eliminate Regal as a competitor and consolidate its market position. (Id. at 72-4 to 72-24.)

**Response: No response is necessary as no material fact is stated. Assuming its truthfulness, it would contradict Plaintiff's theory for his causes of action. If Southern was interested in Regal's business to "consolidate its market position", it would, by definition, have to service Regal's former customers. Purchasing a company's assets, simply to discard them, is not a consolidation, but a waste of resources. In addition, a company whose accounts were, as under Plaintiff's theory, not of interest to Southern would hardly be a competitor that would need to be eliminated.**

47.   From July of 2005 until January of 2006, Southern failed to provide plaintiff with commission statements that would have helped Luscko in his attempts to verify the accuracy of commissions that he was owed or paid. When confronted with this tactic, Southern's manager had no explanation other than he did not think it was important. (Luscko Dep. at Hartmann Decl.

Ex. "B", 59-6 to 60-22; 62-19 to 65-17.)

**Response: Denied. Plaintiff received his commission statements together with his commission check. See Reply Karfunkel Dec., Exhibit B, page 64. In addition, all salespeople got daily summaries, weekly summaries and a monthly tally with their commission checks. See Reply Karfunkel Dec., Exhibit C, page 169. If a salesperson did not, it would be considered shocking. Id. at page 97. Plaintiff has still not provided any documentation identifying the sales for which he received less than a five (5) percent commission.**

48.     Southern converted several of Luscko's accounts to "house" accounts, thereby depriving Luscko of his right to earn his 5% contractual commission on those accounts. (Id., 59-6 to 60-22; 101-7 to 103-11.) The discussion centered upon T-Fal, Bona Packaging and GSA.

**Response: Denied. Of the three accounts in question, Bona Packaging and GSA did not even factor in Plaintiff's assessment of business lost. See Karfunkel Dec., Exhibit O. In addition, Plaintiff continued to earn commissions from sales to T-Fal. See Karfunkel Dec., Exhibit Q, pages 362 and 370.**

49.     Luscko's efforts to originate new business were thwarted for pre-textual or non-existent reasons. No reasons were given, and there is no proof of any exercise of discretion by Southern, other than to refuse new business once Luscko was identified as the originator. (Id., 72-20 to 76-19; 142-3 to 144-23.)

**Response: Denied. Quickie Manufacturing was rejected due to pricing issues; Alcan Pak was rejected because it did not match up with Southern's sales philosophy and Gujurst was lost because of quality, missed deliveries and credit issues. See Karfunkel Dec., Exhibit D, page 73 and Exhibit E, pages 62-63.**

8

50.     Plaintiff's repeated efforts to correct non-shipments, delayed shipments, wrong shipments, wrong quantities and quality assurance issues were ignored, and therefore futile. Defendants' contention that plaintiff did not "complain" about these problems is simply untrue. Plaintiff's attempts to serve his customers and correct the problems (while not always labeled as "complaints") were an exercise in futility. Notably, Hill refused to return Luscko's telephone calls. (Id., 20-5 to 23-21; 44-7 to 44-22; 53-12 to 54-7; 59-6 to 60-22; and 91-20 to 87-20.)

**Response: Admitted that Southern had problems following the transition period, including those caused by the lack of tooling and disorganization that Southern found after the closing. See Reply Karfunkel Dec., Exhibit A, pages 62-63. Southern denies that Plaintiff was ignored. In fact, Southern hired Plaintiff's customer service representative, Linda Birch, to help service his accounts. See Reply Karfunkel Dec., Exhibit C, page 115. In addition, Hill testified that he never received any telephone message from Plaintiff. See Reply Karfunkel Dec., Exhibit A, pages 42-43.**

51.     The sales manager at Southern's Deer Park facility, Mike Petee told Abbie Hoffman that Southern had really "dropped the ball" on Luscko's accounts. (Hoffman Dep. at Ex. "A" to Hartmann Decl., 43-7 to 43-25.)

**Response: Admitted that Plaintiff has accurately portrayed Abbie Hoffman's testimony, but deny that Southern "dropped the ball" as the term suggests that Southern intentionally did not provide quality service to Luscko's accounts. In addition, other long-terms salespeople were suffering tremendously after the Regal acquisition. See Karfunkel Dec., Exhibit F, page 172. Even loyal customers "were revolting". Id.**

52.     Defendants reduced plaintiff's weekly draw from $2,000.00 to $1,500.00. (Luscko Dep. at Hartmann Decl., Ex. "B", 129-11 to 130-10.)

**Response: Denied. This Statement assumes that Plaintiff was entitled to any draw. The Employment Agreement does not provide for any draw. Any draw provided by Southern to Plaintiff was voluntary and subject to change by Southern. See Karfunkel Dec., Exhibit I.**

53.     Early in 2006, Southern falsely accused Luscko of deceitfully being overpaid on his 2005 commission draw by over $16,500.00, even though Luscko had no means of verifying the accuracy of payments that were made to him and had not received commission summaries until January of 2006. Southern's owner demanded immediate repayment of the alleged discrepancy. Eventually, the sum was adjusted over a period of weeks. (Id., 128-13 to 131-18.)

**Response: Denied. In fact, Plaintiff agreed that he was being overpaid the total of $16,500, which was paid out over the course of four months. See Reply Karfunkel Dec., Exhibit E, page 130, line 20, and Karfunkel Dec., Exhibit J, "special deductions" line.**

54.     Southern moved Luscko's office from Dayton, New Jersey to Deer Park, New York. Luscko's Medford, New Jersey home is located in the southwestern part of New Jersey, in Burlington County. It took Luscko more than three hours each way to travel to Deer Park, New York. It was difficult for plaintiff to function out of the Deer Park facility, because of the long commute. (Id., 41-13 to 44-6.)

**Response: Admitted that Plaintiff was transferred to Deer Park, but denied that the transfer would be difficult to Plaintiff. First, Plaintiff never requested to transfer back to Dayton. See Reply Karfunkel Dec., Exhibit E, page 43. Second, and more importantly, Plaintiff performed most of his work by making physical calls to his accounts and was not required to be physically present at the Deer Park location on a regular basis. Id. at page 25, and Karfunkel Dec., Exhibit D, page 43. Therefore, the location of his office**

would have little or no bearing on his commute.

55.     Plaintiff was assigned an unqualified customer service representative at Deer Park, Lai Gorman, who was dismissed. (Hoffman Dep. at Hartmann Decl., Ex. "A", 44-2 to 46-1.)

**Response: Denied. Plaintiff has not accurately portrayed Abbie Hoffman's testimony regarding Lai Gorman's qualifications and the termination of her employment by Southen. See Reply Karfunkel Dec., Exhibit D, page 44. In fact, Lai Gorman was a Complaint Coordinator who continued to work at Southern even after Plaintiff quit. See Reply Karfunkel Dec., Exhibit F (showing data inputted by Lai Gorman on May 5, 2006).**

56.     Luscko's immediate supervisor, Tim Kelly, suggested to a customer that Luscko's computer e-mail was a source of pornographic materials. (Luscko Dep. at Hartmann Decl., Ex. "B", 154-13 to 155-22.)

**Response: Admitted that Tim Kelly wrote an e-mail to a customer, but deny that it was to suggest that Plaintiff's computer was a source of pornographic materials. Tim Kelly explained that it was a joke and was a one-time event. See Reply Karfunkel Dec., Exhibit B, pages 86-87.**

57.     Abbie Hoffman, Regal's former principal and an employee of Southern when she was deposed, testified under oath that plaintiff had sales of $5.5 million dollars at the time Southern acquired Regal in May of 2005. Hoffman estimated that Plaintiff's sales on his accounts had dropped from $5.5 million to $400,000.00 (through no fault of plaintiff) when Luscko left Southern less than one year later, in April of 2006. (Hoffman Dep. at Hartmann Decl. Ex. "A", 72-25 to 75-3; 92-25 to 93-8.)

**Response: Admitted that Plaintiff's sales had dropped, but deny the accuracy**

of the $5.5 million dollar figure. See Karfunkel Dec., Exhibit P (Form W-2 for 2004 showing income of $250,826).

58.     For the calculation of the hours worked, see Luscko Dep. at Hartmann Decl., Ex. "B", 147-20 to 148-19.

**Response: Denied. Plaintiff has not accurately portrayed his own testimony. See Reply Karfunkel Dec., Exhibit E, pages 147-148. Plaintiff's testimony was in the context of explaining a commission statement. Plaintiff testified that Southern "determined that a workweek was 40 hours" for retirement credits, but he never testified that he actually worked that amount of hours. Id.**

HERBERT NEW & DAVID W. NEW, P.C.
Attorneys for Defendants

By:     _Benjmm A Kerfukel_____
BENJAMIN A. KARFUNKEL

Dated: September 25, 2009